**R. E. SOUTHERLAN et al.**

v.

**OFFICE AND PROFESSIONAL EM-
PLOYEES INTERNATIONAL UNION,
LOCAL NO. 277, AFL–CIO, and Gen-
eral Dynamics Corporation.**

**Civ. A. No. CA 4–2318.**

United States District Court,
N. D. Texas,
Fort Worth Division.

June 20, 1975.

Hugh M. Smith, Schoolfield & Smith, Dallas, Tex., for plaintiffs.

Sam Houston Clinton, Jr., Clinton & Richards, Austin, Tex., for Office and Professional Employees.

J. Olcott Phillips, McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Fort Worth, Tex., for General Dynamics.

### MEMORANDUM OPINION

MAHON, District Judge.

The plaintiffs bring suit pursuant to the Labor Management Relations Act, 29 U.S.C. § 185(a), alleging that the defendant, Union Local 277, breached its duty to fairly represent all the employees in the bargaining unit, and that General Dynamics breached the collective bargaining agreement. After a one week trial before the Court beginning on February 24, 1975, the Court makes the following findings of fact and conclusions of law.

This case involves the complex labor problems arising when a large company automates certain work and attempts to transfer the high seniority employees performing that work into other jobs at a time when the work force is being reduced and layoffs are imminent. In 1967, the Company, General Dynamics,[1] began the installation of an electronic data processing system which was to perform work then performed by the job classification of Timekeeper "A". The system was to completely replace all timekeepers by August 1970. The plaintiffs in this case are the former timekeepers. The new system performs approximately seventy-five percent of the work previously performed by the timekeepers. The delivery of weekly paychecks, another twenty percent of the timekeepers' work, was taken over by department supervisors as the timekeepers in their departments were replaced by the system. Thus, almost the entire job of timekeeper was eliminated.[2]

On March 6, 1967, shortly after the first timekeepers had been replaced, a grievance was filed complaining of the distribution of paychecks by supervisors in three departments. The grievance was settled on October 8, 1968, when the Company and the International Association of Machinists (IAM), who represented the timekeepers, entered a settlement agreement which provided that the Timekeepers "A" on the payroll as of March 25, 1966, would transfer into the unit represented by Union Local 277 as Accounting Clerks "A" "if practicable". The defendant, Union Local 277, was not a party to this settlement and was not bound by it. This fact becomes important because the job experience of the timekeepers, as defined in the collective bargaining agreement,[3] did not permit

---

1. General Dynamics' business is centered around obtaining government contracts to build military aircraft, and, similar to others in the defense industry, it experiences rapidly changing employment needs.

2. The plaintiffs tried the case on the theory that they were transferred when their jobs were eliminated. They now argue in their brief that the job also transferred. The Court finds the evidence to be completely to the contrary. The only transfer of work was the delivery of the paychecks by the supervisors, and, of course, they were not members of the unit into which the timekeepers were transferred. There is no logic in installing an electronic data processing system to replace the work done by the timekeepers and then have them duplicate that work under another job title. The plaintiffs do not claim that the duties of accounting clerk changed subsequent to their transfer. The accounting clerks had certain duties both prior and subsequent to the installation of the new system. The timekeepers had other duties, and it was these duties which were eliminated. Most of the plaintiffs admitted that the duties of the two positions were different. The remainder did not explain why there was a need for two to three week's training after transferring to accounting clerk if it was the same work they had performed as timekeepers for twenty to thirty years. This fact was further evidenced when two high seniority timekeepers could not learn their new duties as accounting clerks even after several weeks training and were laid off.

3. Article VIII, §§ 3–B and 5–A of Company Exhibit 4 required the plaintiffs to have held the other jobs for a period of thirty-five days as a matter of company record to be entitled to transfer.

or authorize them to transfer to other jobs either in the machinist unit or in the Union Local 277 unit. Their only rights of transfer and regression under the contract were into other departments as Timekeepers "A" or into the Timekeeper "B" classification which was also being eliminated.

The Company began to make occasional transfers of timekeepers into the Accounting Clerk classification in early 1967. These were scattered instances in which only one or two timekeepers would be transferred in a period of several months. Although there were complaints by incumbent accounting clerks who felt their seniority and promotion rights were adversely affected, the Company and Union Local 277 were able to cooperate to facilitate the transfers without grievances being filed. This was due in large part to an expanding work force and the small likelihood of a layoff. By June 1970, however, the outlook had changed. The work force at the Company had steadily declined and the possibility of a further reduction in force was great. At the same time the Company was completing the installation of the data processing system in the remaining departments and the nine remaining high seniority timekeepers were to transfer into the Union Local 277 unit within approximately one month.

On June 29, 1970, Plaintiff Harrison was transferred from Timekeeper "A" to Accounting Clerk "A". It was understood he was soon to be followed by the remaining timekeepers. The incumbents in Local 277 were up in arms because if these remaining timekeepers were allowed to transfer and bring their high seniority they could "bump" any less senior accounting clerk in the entire Union Local 277 unit. Fifty-five accounting clerks, including some former timekeepers who had already transferred, filed grievances to prevent the transfer of Harrison and the remaining timekeepers. The basis of these grievances were: [4]

1. Section 10–A of Article VIII of the Agreement between the Company and Union 277, effective August 11, 1969 (Plaintiffs Ex. 1), prevented transfers into a department unless a person was "capable of performing". (See, Section 5–A of Article VIII.) Neither Harrison nor the other Plaintiffs to follow him could meet this test because they had not previously held for 35 days the job classification into which they were seeking to transfer;

2. Section 12–A of Article VIII gave a qualified employee in the department the right to promotion to a vacancy in that department. The evidence showed that there were enough qualified Accounting Clerks "B" to fill all of the vacancies in Accounting Clerk "A" into which Harrison, and the Plaintiffs to follow him, were seeking to transfer. Also, if the high seniority Timekeepers transferred into the unit, then their seniority would entitle them to consideration ahead of less senior Accounting Clerks "A" for the next promotion to a vacancy in the classification of Accountant "B";

3. Of considerable concern was the fact that the high seniority Timekeepers, once they got into the 277 unit, could utilize their seniority to bump less senior Accounting Clerks not only within their department, but also anywhere within the entire 277 unit (Section 3–B of Article VIII).

The strong emotions that existed in the Union Local 277 unit regarding the transfers made any attempt at transfer impractical at that time. The accounting clerks and Union Local 277 were intent on protecting their rights under the collective bargaining agreement. The Company, however, was equally intent on finding a place for the remaining

---

4. See Plaintiffs' Exhibits 5 and 6.

timekeepers most of whom had twenty to thirty years' experience. In the Company's view it would be unjust to lay off these high seniority timekeepers while allowing other former timekeepers with less seniority to remain merely because they had been fortunate enough to transfer prior to the filing of the grievance. J. B. Moss, the president of Union Local 277, and R. B. Craig, an official of the Company, began negotiations in an attempt to achieve a solution to the problem. It is significant that these were the men who had negotiated the existing collective bargaining agreement.

On July 7, 1970, their negotiations consummated in an agreement which allowed the remaining timekeepers to transfer into the unit.[5] The agreement called for equal treatment of all timekeepers whose jobs had been eliminated by the new system including those who had transferred prior to the agreement. The agreement provided that three former timekeepers were to be laid off for each two incumbent accounting clerks, and that the former timekeepers would not have promotion, regression, or lateral transfer rights.[6]

The timekeepers were then transferred into the unit as Accounting Clerks "A". Within several days all of the plaintiffs knew of the agreement reached between the Company and Union Local 277, and understood the restrictions it placed upon their seniority. In December 1970 the plaintiffs met with J. B. Moss to discuss the possibility of rescinding the June 1970 agreement. Mr. Moss stated that the agreement could not be revoked.

Subsequent to their transfers the former timekeepers were trained for several weeks in their new duties, and during this time they carried approximately one-half the workload of the other accounting clerks. The plaintiffs Harper and Sims were unable to adjust to the new work and were discharged for inability to perform.[7] The remaining plaintiffs, except Mr. Southerlan, continued as accounting clerks for periods of six months to several years,[8] and were then either laid off in accordance with the collective bargaining agreement,[9] quit,[10] took medical retirement,[11] or took early retirement.[12]

Mr. Southerlan was a former timekeeper, but he occupied a salaried position at all times relevant to this case. He was not on the list of Timekeepers "A" as of March 25, 1966, who were to be transferred to Accounting Clerks "A". Mr. Southerlan admits that under his contract as a salaried employee the Company had a choice of regressing him

---

5. Plaintiffs' Exhibit 7.

6. Sufficient evidence was not presented to determine if the plaintiffs would have had a right to regress to Accounting Clerks "B" if the agreement of July 7, 1970 had not been entered. Although they would never have held that job for 35 days as required by the contract, they might have a right to regress if they were in the same seniority grouping. The findings of the Court, however, render consideration of this right to regress unnecessary.

7. The Court finds from the evidence presented that Harper and Sims were unable to perform, and that the Company was justified in firing them. The record reveals that they had significantly more errors while performing only one-half the average workload.

8. The evidence revealed that the agreement allowing the timekeepers to transfer into the

unit permitted the plaintiffs to work from several months to several years longer than if they had been laid off as timekeepers.

9. These include Burton, McClure, Saffell, and Swackhammer, who transferred prior to the agreement, and Harrison, Caddell, and Parrish who subsequently transferred.

10. Mr. Wiggins testified that he could not perform the new work, and on March 19, 1971, he resigned.

11. Mr. West was not able to work after July 23, 1971, because of a heart condition. On March 22, 1972, he began to receive insurance benefits for total and permanent disability.

12. Dotson took early retirement on April 30, 1975, because he had been physically disabled and unable to work since July 28, 1971. Hoover and Harrell also took early retirement for personal reasons.

to his former position or laying him off. On May 23, 1973, the Company chose to lay him off. He claims that the Company should have regressed him to time-keeper, a position eliminated almost three years earlier, and then transferred him to accounting clerk with his full seniority. The Court finds that the Company had the sole right to elect whether to regress or lay off Mr. South-erlan. Further, the Court finds that other salaried employees had been laid off rather than regressed.

The factual situation presents several issues, but the Court's decision regarding the nature of the June 7, 1970, agreement and the Union's conduct in negotiating that agreement renders any further discussion unnecessary.

The first issue presented is the character of the June 7, 1970, agreement. The plaintiffs cast the agreement as the settlement of a grievance because their theory of recovery is that a grievance was settled outside the terms of the contract and therefore was void. The Union and Company, however, characterize the agreement as a valid amendment to the existing contract.

The agreement of June 7, 1970, arose out of grievances filed to prevent the transfer of Harrison into the unit. Although the agreement settled those particular grievances, it certainly went much further. Obviously, the agreement also pertained to the timekeepers yet to transfer and was the vehicle which allowed their peaceful integration into the unit. In the absence of the agreement, the Company would have had no choice but to lay off the nine remaining timekeepers. Further, the agreement established new provisions for all of the former timekeepers including those who had transferred prior to the agreement. The agreement established new seniority, lay off-recall, and promotion rights for the entire class of former timekeepers whose jobs had been eliminated by automation. The approach taken was equitable. It treated all the former timekeepers equally rather than distin-guishing between the plaintiffs on the sheer circumstance of when their particular job was eliminated and they were transferred.

The agreement did more, however, than merely restrict the rights of the plaintiffs. It also restricted the rights of the accounting clerks already in the unit. The incumbent Accounting Clerks "B" no longer had the same promotion expectations which existed prior to the agreement. Under the collective bargaining agreement, the former timekeepers were not qualified to hold the Accounting Clerks "A" job, and the Accounting Clerks "B" had a right under the contract to be promoted to fill any vacancy. The agreement restricted their promotion expectations by allowing the existing vacancies to be filled by the transferring timekeepers. The layoff and recall rights of the incumbent Accounting Clerks "A" were also adversely affected. By providing a layoff ratio of three former Timekeepers "A" to two Accounting Clerks "A" the agreement obviously called for the layoff of some Accounting Clerks "A" prior to the time they otherwise would have been reached. The incumbent Accounting Clerks "A" had a right to regress into the Accounting Clerks "B" classification when a reduction in force occurred. This, of course, necessitated the layoff of Accounting Clerks "B" prior to the time they would have been laid off if the timekeepers had not been allowed to transfer.

The agreement of June 7, 1970, thus amended and changed conflicting provisions in the existing collective bargaining agreement. The agreement was a solution of the problems arising from the conflict of the seniority, the promotion and transfer provisions, and the provision regarding the contractual qualifications necessary to obtain and hold a job. It was negotiated by the same Union and Company representatives who had negotiated the existing collective bargaining agreement, and it solved a situation which was not contem-

plated by the collective bargaining agreement. The Court specifically finds that the settlement agreement of June 7, 1970, was an amendment to the existing collective bargaining agreement.[12]

■ It is well settled that the Company and the Union have the authority to amend the collective bargaining agreement. In *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the Supreme Court expressly approved of an amendment to an existing bargaining agreement which adversely affected the seniority rights of some employees. This principle was reaffirmed in *Humphrey v. Moore*, 375 U.S. 335, 345, 84 S.Ct. 363, 11 L.Ed.2d 370 n. 7 (1964). In 1968 the Fifth Circuit stated that "The case law is clear that an oral agreement between parties to a collective bargaining contract may modify, supplement or amend the collective bargaining contract." *Watson v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, et al.*, 399 F.2d 875, 879 (5th Cir. 1968). Of course, this statement would be just as true when the amendment is written.

The cases further reveal that amendments may be valid even though they adversely affect the rights of some employees. In *Huffman, supra*, the amendment to the existing collective bargaining agreement retroactively changed the seniority rights of the plaintiffs by giving all employees credit for pre-employment as well as post-employment military service. This, in effect, reduced the seniority of some employees who had earlier hire dates but less military service than other employees. In a suit to invalidate the amendment, the Court held that the amendment was valid and because the Union had acted honestly

and in good faith it did not breach its duty of fair representation.

■ The second issue then becomes whether the Union's actions in negotiating the amendment were a breach of its duty of fair representation. *Huffman, supra*. The Union's duty of fair representation extends both to the collective bargaining process and to the enforcement of the collective bargaining agreement. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). All parties to this suit agree that *Vaca, supra*, sets the standard to be applied in determining if the duty of fair representation has been breached. That standard "includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise discretion with complete good faith and honesty, and to avoid arbitrary conduct." The exclusive bargaining agent, however, still has broad discretion in carrying out its duties. As the Supreme Court pointed out in *Huffman, supra*:

"Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

In Humphrey, supra, the Court further noted that the Union should be free to take a good faith stand advantageous to some employees and adverse to others.

---

12. The plaintiff's argument that the defendants were contractually precluded from amending the contract is meritless. The parties had the power to amend the contract at any time, and, in fact, entered many mutual agreements amending the contract. Further, the entire 1965 contract was amended almost two years prior to its expiration date. Thus, under plaintiff's reasoning, the contract which they allege the Company breached was already invalid because it was negotiated more than 140 days prior to the expiration date.

In finding no breach of the duty of fair representation the Court stated that:

"We are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. * * * Just as a union must be free to sift out wholly frivilous grievances which would only clog the grievance procedure, so it must be free to take a position on the not so frivilous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these circumstances would surely weaken the collective bargaining and grievance processes."

In this case the Union found itself in a situation where it could not completely satisfy all of the employees in the unit. Given the existing situation, it did not choose to wholly support one segment against the other. The settlement agreement was a give and take situation in which all of the employees represented by the Union lost some rights in exchange for others. The plaintiffs who were not in the unit also lost some rights in exchange for others.[13] The agreement was not arbitrary or discriminatory, but rather represented the best possible approach to the existing problem. The Court specifically finds that the agreement was reasonable and that there was no bad faith on the part of the Union or the Company.

The Court finds that Local 277 and General Dynamics negotiated in good faith in reaching the settlement agreement of June 7, 1970. The Court finds that the agreement was not arbitrary or discriminatory but rather an attempt to reach the fairest result possible in the existing situation. Finally, the Court finds that the agreement amended the existing contract, the amendment was valid, the plaintiffs were laid off in accordance with the contract, and the Company therefore did not breach the contract.

A determination that the Union did not breach its duty of fair representation and that the Company did not breach the contract obviates the necessity of a decision on the remaining issues.[14]

It is therefore ordered that the plaintiffs take nothing with each side to bear its own costs.

13. The plaintiffs contend that the Union owed a duty of fair representation to all of the plaintiffs in negotiating the June 7, 1970, agreement. Their view imposes the same duty on the Union in regard to Mr. Southerlan, who has never been in the unit, and the timekeepers who transferred after June 7, 1970, as it does to the incumbent accounting clerks and the timekeepers who transferred prior to June 7, 1970. A Union cannot reasonably be expected to protect the interests of both its members and all outside individuals. Obviously, as in the present case, those interests will often conflict. To require any such duty of the Union would place it in an impossible situation of protecting outsiders to the detriment of its members, and this would surely result in a suit for breach of its duty of fair representation. The duty of fair representation was owed only to the members of the unit represented by Local 277 at the time of the agreement, and not to the plaintiffs who had not yet transferred into the unit.

14. Resolution of these issues precludes the necessity of deciding:
(a) If the agreement was merely the settlement of a grievance, was it a fair determination of the contract and lawful under *Sanderson v. Ford Motor Co.*, 483 F.2d 102 (5th Cir. 1973).
(b) Did any of the plaintiffs fail to exhaust administrative remedies.
(c) Did any of the plaintiffs waive their rights by taking voluntary retirement.
(d) Does the statute of limitations bar this action.
(e) What was the effect on the plaintiffs who were laid off after the agreement had been carried forward into the 1972 contract.