614 F.2d 1322
 22 Fair Empl.Prac.Cas. 846,
22 Empl. Prac. Dec. P 30,822
UNITED STATES of America, Plaintiff-Appellee,
v.
The CITY OF MIAMI, FLORIDA, et al., Defendants-Appellees,
Fraternal Order of Police, City of Miami Lodge No. 20,
Kenneth R. Harrison, President, and The Miami
Police Benevolent Association,
Defendants-Appellants.
 No. 77-1856.
 United States Court of Appeals, Fifth Circuit.
 April 10, 1980.
 
 Irving Weinsoff, Miami, Fla., for defendants-appellants.
 David L. Rose, Squire Padgett, Dept. of Justice, Civ. Rights Div., Washington, D. C., for plaintiff-appellee.
 George F. Knox, Jr., Miami, Fla., for City of Miami.
 Appeal from the United States District Court for the Southern District of Florida.
 Before THORNBERRY, GOLDBERG and GEE, Circuit Judges.
 GOLDBERG, Circuit Judge.
 
 
 1
 Today we have before us a pair of cases involving the interrelationship of "reverse discrimination," affirmative action, and the principles governing consent decrees. In this case, along with the companion case of United States v. City of Alexandria, 614 F.2d 1358 (5th Cir. 1980), we are faced with novel and difficult issues concerning consent decrees negotiated between the federal government and representatives of local governments settling suits alleging a "pattern or practice" of employment discrimination. We hold here that the district court acted properly in approving the consent decree presented for his approval, because the consent decree is not unreasonable, unconstitutional, illegal, or against public policy. In so holding, we necessarily reach the question of the status of affirmative action after the Supreme Court's decision in Regents of University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and affirm the post-Bakke validity of race- and sex-conscious affirmative action plans in this circuit. The two cases also require us to explore in some detail the roles and responsibilities of the parties to the lawsuit, the district judge, and the appellate court in this consent decree context.
 
 
 2
 The procedural history of this case involved a large amount of skirmishing over various issues. The history which is germane to this appeal will be set out at some length, although very little of substance occurred. On December 29, 1975, the Attorney General filed a Complaint against the City of Miami, various of its officials, and several organizations of police officers alleging that the defendants were engaged in policies and practices that discriminate against black, Spanish-surnamed, and female individuals with respect to employment opportunities and conditions of employment within the City of Miami, in violation of Title VII of the Civil Rights Act of 1964, the Fourteenth Amendment to the Constitution of the United States, and 42 U.S.C. §§ 1981 and 1983. The Complaint sought preliminary and permanent injunctive relief. Jurisdiction was predicated on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 42 U.S.C. § 3701 et seq., and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1242.
 
 
 3
 On December 30, 1975, Defendant City of Miami filed an answer denying the substantive charges of discrimination. On January 28, 1976, Defendants Fraternal Order of Police (FOP) and Miami Police Benevolent Association (PBA) filed an Answer denying the substantive allegations of the Complaint and raising thirteen affirmative defenses.[1] On February 18, 1976, a consent decree, agreed to by the United States and the City of Miami, was approved by the court. The decree states that it does not constitute an adjudication or an admission by any of the defendants of any violation of law, and provides for affirmative action in hiring and promotional procedures in favor of blacks, Spanish-surnamed individuals, and women. On February 27, 1976, FOP and PBA filed a motion to vacate the consent decree, asserting several grounds for its invalidity. On April 2, the court issued an order vacating the consent decree, finding that some of the activities ordered on the part of the City of Miami violated certain provisions of the collective bargaining agreement between the City and FOP and PBA.[2]
 
 
 4
 On May 28, 1976, the United States and the City of Miami jointly moved for re-entry of the consent decree. A similar motion was filed on November 17, 1976,[3] accompanied by an affidavit attesting that the FOP and the City had been unable to negotiate their differences and by a statement of uncontested facts containing statistics concerning the composition of the labor force in the Miami area and of the workforce employed by the City.
 
 
 5
 After a hearing before the court on December 13, the United States and the City of Miami made several modifications in the proposed decree, responding to the court's concerns raised at the hearing. After a further hearing on February 8, 1977, at which the court raised other concerns relating to the decree, the court finally re-entered the decree, as modified, on March 31, 1977.[4] It found that the decree did not violate the contractual relationship between the City and the FOP and PBA. The FOP and PBA appealed the order re-entering the consent decree, and unsuccessfully sought to stay enforcement of the judgment pending appeal.
 
 
 6
 In sum, then, the relevant procedural history on this appeal is that a complaint was filed, defendants answered, and a consent decree was signed between the United States and the City of Miami over the objections of the unions which represent Miami Police Officers. We must decide whether the court properly entered the decree.
 
 I.
 
 7
 We will first address two preliminary contentions of the FOP that the Attorney General lacked authority to institute this action, and that the court could not have approved the decree without the consent of the FOP.
 
 A. Authority of Attorney General
 
 8
 FOP argues that the Attorney General lacks authority to institute this action under the 1972 amendments to Title VII, 42 U.S.C. § 2000e-6,[5] which effected a transfer of authority concerning "pattern or practice" suits from the Attorney General to the EEOC. The Attorney General argues that this transfer of authority only related to suits against private employers, and that the Attorney General retained authority to initiate pattern or practice suits against public employers.
 
 
 9
 Although for some time the ultimate resolution of this issue remained doubtful, see United States v. Board of Education of Garfield Heights, 581 F.2d 791 (6th Cir. 1978); United States v. South Carolina, 445 F.Supp. 1094, 1110-1111 (D.S.C.1977) (three-judge court), aff'd without opinion, 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978), Congress has recently spoken plainly concerning its intent when the 1972 amendments were made. Both the Senate and House Committee Reports to Reorganization Plan No. 1 of 1978[6] have clearly stated that the 1972 transfer of authority related only to suits against private employers, and that the Attorney General retained jurisdiction to initiate pattern or practice suits against state and local governments. See S.Rep.No.750, 95th Cong., 2d Sess. 4 (1978); H.R.Rep.No.1069, 95th Cong., 2d Sess. 8 (1978).[7] After these reports, there can be little doubt that the 1972 amendments did not deprive the Attorney General of authority to bring pattern or practice suits against public employers. See United States v. Fresno Unified School District, 592 F.2d 1088 (9th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979); United States v. North Carolina, 587 F.2d 625 (4th Cir. 1978); Garfield Heights, supra, 581 F.2d at 792 (dissenting opinion).
 
 
 10
 Even if the legislative history is not accepted as conclusive, we perceive no injustice in allowing the Attorney General to sue, and therefore apply the law in effect at present. Our duty is to apply the law as it stands at the time we render our decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. Bradley v. School Board of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Accord Cort v. Ash, 422 U.S. 66, 77, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).
 
 
 11
 Moreover, the Attorney General was amply authorized to institute suit by two independent statutory provisions, Section 122 of the State and Local Fiscal Assistance Act of 1972, P.L. 92-512, 86 Stat. 932 (Oct. 20, 1972)[8] and Section 518 of the Crime Control Act of 1973, P.L. 93-83, 87 Stat. 214 (Aug. 6, 1973).[9] The relevant provisions of these Acts at the time suit was instituted were very similar. Each act prohibited discrimination in all programs and activities which receive funds under it,[10] and each empowered the Attorney General, whenever he "has reason to believe that a State government or unit of local government is engaged in a pattern or practice in violation of the provisions of this section," to "bring a civil action in any appropriate United States district court for such relief as may be appropriate, including injunctive relief." State and Local Fiscal Assistance Act of 1972, supra, § 122(c); Crime Control Act of 1973, supra, § 518(c)(3).
 
 
 12
 Since the City has stipulated that it is a recipient of federal funds under each of these statutes, the authority of the Attorney General to bring suit under these statutes is unquestionable. Moreover, the standards to be applied, at least in a suit in which the Attorney General's authority is based on 42 U.S.C. § 3766, are the same as those applied under Title VII. See H.R.Rep.No.94-1723, 95th Cong., 2d Sess. at 32, reprinted in (1976) U.S.Code Cong. & Admin.News at pp. 5374, 5418.
 
 B. Necessity of FOP's Consent
 
 13
 The FOP argues that the trial court should not have approved the consent decree without the approval of the FOP. This argument involves two separate contentions. First, the FOP asserts that it has been deprived of its "day in Court" by the waiver of findings of fact by the signatories to the consent decree.[11] Second, it argues that its exclusion from the consent decree violates Fed.R.Civ.P. 19.
 
 
 14
 Both of these arguments are meritless. The FOP misses the crucial point here, to wit, that the consent decree orders no relief against the FOP. Unless the FOP can demonstrate that it has been ordered to take some action by the decree, or ordered not to take some action,[12] or that its rights or legitimate interests have otherwise been affected, it has no right to prevent the other parties and the Court from signing the decree.[13] The FOP has made no such showing. In fact, the district court specifically found that the consent decree does not violate the contractual relationship between the City and the FOP, and this finding is not challenged on appeal.
 
 
 15
 The FOP's Fed.R.Civ.P. 19 argument fails for the same essential reason: no rights of the FOP are affected by the decree. Even if the FOP was at the outset a "necessary" party under Fed.R.Civ.P. 19,[14] once it was determined that the consent decree would not affect the FOP's rights, it was not a "necessary" party to the judgment. Fed.R.Civ.P. 20 explicitly provides that "(j)udgment may be given . . . against one or more defendants according to their respective liabilities," making it clear that a judgment, consensual or otherwise, need not necessarily include all defendants in the lawsuit.
 
 II.
 
 16
 Next, we must discuss the roles of the trial and appellate courts in approving consent decrees in suits brought by the Attorney General or the EEOC enforcing obligations under Title VII.
 
 A. Trial Court
 
 17
 In what can be termed "ordinary litigation," that is, lawsuits brought by one private party against another private party that will not affect the rights of any other persons, settlement of the dispute is solely in the hands of the parties. If the parties can agree to terms, they are free to settle the litigation at any time, and the court need not and should not get involved. As Judge Wyzanski has described this situation: "the traditional view is that the judge merely resolves issues submitted to him by the parties . . . and stands indifferent when the parties, for whatever reason commends itself to them, choose to settle a litigation." Heddendorf v. Goldfine, 167 F.Supp. 915, 926 (D.Mass.1958).
 
 
 18
 Moreover, procedurally it would seem to be impossible for the judge to become involved in overseeing a settlement, because the parties are free at any time to agree to a resolution of the dispute by private contractual agreement, and to dismiss the lawsuit by stipulation.[15] In this situation, then, the trial court plays no role in overseeing or approving any settlement proposals.
 
 
 19
 In contrast, there are certain special situations in which the trial court is required by statute or rule to approve a settlement to which the parties to the litigation have agreed. The three most prevalent examples of this are proposed class action settlements, proposed shareholder derivative suit settlements, and proposed compromises of claims in bankruptcy court.[16] See, e. g., Protective Committee v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); McDonald v. Chicago Milwaukee Corp., 565 F.2d 416 (7th Cir. 1977); United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); Grunin v. International House of Pancakes, 513 F.2d 114 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); Young v. Katz, 447 F.2d 431 (5th Cir. 1971); Norman v. McKee, 431 F.2d 769 (9th Cir. 1970); Florida Trailer and Equipment Co. v. Deal, 284 F.2d 567 (5th Cir. 1960); Heddendorf v. Goldfine, 167 F.Supp. 915 (D.Mass.1958).
 
 
 20
 In these three situations, the standard for approval has been stated both positively that the trial court must find that the settlement is fair, adequate, and reasonable, see, e. g., Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977); West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971) (quoting district court judge) and negatively that the trial court may only approve a settlement after determining that its terms are not unlawful, unreasonable, or inequitable, see, e. g., United States v. City of Jackson, 519 F.2d 1147, 1151 (5th Cir. 1975).
 
 
 21
 We have been unable to discern any difference in meaning between these variants on what we perceive to be essentially one standard; nor does the standard vary in application between the three different types of cases. In each of the three situations bankruptcies, class actions, and shareholder derivative suits there are special considerations not present in ordinary litigation which make this standard appropriate. In the bankruptcy situation, the "fair and equitable" standard was mandated by a statute, 11 U.S.C.A. §§ 574, 621(2) (West 1970) (repealed, P.L. 95-598, 92 Stat. 2549 (1978)); see TMT Trailer Ferry v. Anderson, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). In the class action and shareholder derivative suit contexts, the Federal Rules of Civil Procedure require that the court approve the settlement before the action is dismissed or compromised, see Fed.R.Civ.P. 23(e) and 23.1, and careful scrutiny is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members or shareholders. The court's role as a fiduciary serving as guardian for the unrepresented class members has been held to stem directly from the language of the relevant rule. See, e. g., Grunin, supra, 513 F.2d at 123; Heddendorf, supra, 167 F.Supp. at 925-26.
 
 
 22
 Because there have been few situations other than the three special situations in which trial courts have been asked to approve a settlement, and the language in some of the cases involving these special situations has been expressed without limiting its application to the type of lawsuit involved, there may have been reason to believe that whenever a trial court is asked to approve a settlement, he must determine that the settlement is abstractly "adequate," and that his decision to this effect will be routinely approved by us on review.[17]
 
 
 23
 As we have noted, however, an active role for the trial court in approving the adequacy of a settlement is the exceptional situation, not the general rule. Even in the situations requiring court scrutiny, it has been said that, even after the court has inquired into the facts and law of the case, it need not reach any ultimate conclusions concerning how the case would be decided at trial, see Cotton, supra, 559 F.2d at 1330; indeed, trial judges have been told that absent fraud, collusion, or the like they should be hesitant to substitute their judgment for that of experienced counsel, even when those counsel represent private interests. See id. at 1332 nn.2 & 3.
 
 
 24
 Here, we are faced with a situation somewhat different from that posed by ordinary litigation, for the interests of individuals and organizations other than those approving the settlement may be implicated. The presence of these other interests prevents us, or the trial court, from taking a totally "hands-off" attitude toward the settlement reached. In fact, if this were merely a suit between private parties in which interests of non-parties were implicated, we might be inclined to endorse a fairly active role for the trial court in determining the fairness of the settlement. However, several factors convince us that the trial court properly took an intermediate stance.
 
 
 25
 First is the extremely high premium put by Congress on voluntary settlement of Title VII suits. There have been repeated asseverations of this principle. In Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974), the Supreme Court said: "Cooperation and voluntary compliance were selected (by Congress) as the preferred means for achieving (the goal of elimination of unlawful employment discrimination)." This Court has wholeheartedly endorsed that conclusion. See, e. g., Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977); United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826, 846 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) ("it cannot be gain-said that conciliation and voluntary settlement are the preferred means for resolving employment discrimination disputes") (Thornberry, J.); Hutchings v. United States Industries, Inc., 428 F.2d 303, 309 (5th Cir. 1970) ("it is clear that Congress placed great emphasis upon private settlement and the elimination of unfair practices without litigation on the ground that voluntary compliance is preferable to court action" (citation omitted) (Ainsworth, J.), Culpepper v. Reynolds Metals Co., 421 F.2d 888, 891 (5th Cir. 1970) ("the central theme of Title VII is 'private settlement' as an effective end to employment discrimination") (Tuttle, J.); Dent v. St. Louis-San Francisco Ry. Co., 406 F.2d 399, 402 (5th Cir. 1969) ("the basic philosophy of (Title VII) is that voluntary compliance is preferable to court action and that efforts should be made to resolve these employment rights by conciliation both before and after court action") (Coleman, J.); Oatis v. Crown Zellerbach Corp, 398 F.2d 496, 498 (5th Cir. 1968) ("it is thus clear that there is great emphasis in Title VII on private settlement and the elimination of unfair practices without litigation") (Bell, J.). To insist on a detailed inquiry by the trial court into every proposed settlement of a Title VII action would severely interfere with this policy by delaying approval of settlements and increasing their cost to litigants.
 
 
 26
 Second is the fact that the plaintiff here is a department of the United States government. Unlike the situations in which we fear that a party may be attempting the profit at the expense of unrepresented individuals, e. g., class actions and shareholder derivative suits, we here have as plaintiff the government department charged with seeing that the laws are enforced. We therefore need not fear that the pecuniary interests of the plaintiff and defendant will tempt them to agree to a settlement unfair to unrepresented persons,[18] but can safely assume that the interests of all affected have been considered.[19]
 
 
 27
 Moreover, a careful calibration by the trial court to ensure that the relief granted goes exactly as far, but no further, than is required by the extent of the past illegal discrimination is impossible.[20] Before trial, there is no way of knowing which particular practices of the defendants may have contributed to the gross statistical disparities presented in their workforces.[21] However, there are parties present before the court who have spent long hours negotiating over the situation and who are intimately familiar with the practices of the defendants the defendants themselves and the Justice Department officials responsible for the lawsuit. The Justice Department and the defendants are in an adversary posture. The defendants do not want to give up more control over their personnel decisions than is absolutely necessary. The Justice Department officials are charged with seeing that violations of our employment discrimination laws are remedied.
 
 
 28
 There are other reasons for a deferential attitude towards agreements reached by consent in Title VII suits. As this court has previously noted, when agreement is reached by consent voluntary compliance is rendered more likely, and the government may have expeditious access to the court for appropriate sanctions if compliance is not forthcoming. See City of Jackson, supra, 519 F.2d at 1152 n.9. Moreover, failure to enter the decree would result in the loss of "the nation's investment in the resources consumed by the federal agencies in negotiating these decrees, as well as the chance justly to finalize a matter that otherwise would burden agencies and courts." Allegheny-Ludlum, supra, 517 F.2d at 851.
 
 
 29
 We also note that if the government agency negotiating with the defendants to remedy discrimination had been the Equal Employment Opportunity Commission rather than the Department of Justice, and if a conciliation agreement with exactly the same terms as the proposed consent decree had been reached between the E.E.O.C. and the defendants, the district court's scrutiny of the terms of the agreement would be minimal. In Equal Employment Opportunity Commission v. Contour Chair Lounge Co., 596 F.2d 809 (8th Cir. 1979), the Eighth Circuit upheld the district court's determination, 457 F.Supp. 393 (E.D.Mo.1978), that conciliation agreements between the E.E.O.C. and employers are specifically enforceable. Neither the trial court nor the appellate court conducted a detailed inquiry into the reasonableness of the agreement; rather, each independently satisfied itself that the agreement contained no illegal terms, and specific performance was ordered without further inquiry. We are unaware of any difference between the roles that the Department of Justice and the E.E.O.C. play in enforcing the antidiscrimination provisions of Title VII that requires courts to order specific performance of voluntary settlement agreements with the E.E.O.C. after a minimal inquiry into their legality, but enables a court to freely overrule agreements reached by the Department of Justice merely because the court would have reached a different result.
 
 
 30
 For these reasons, we hold that in this situation the trial court need only determine that the proposed settlement is not unconstitutional, unlawful, cf. Kelly v. Kosuga, 358 U.S. 516, 520, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959) (court will not enforce contract which violates the law), contrary to public policy, or unreasonable before approval is granted. Moreover, for these same reasons, we believe that the decree proposed in these circumstances should be entitled to a presumption of validity.
 
 
 31
 This presumption of validity means that a district court judge must have a principled reason for refusing to sign a consent decree in this context. A refusal to sign a consent decree based on generalized notions of unfairness is unacceptable. Rather, the district court judge must state specific reasons why a proposed consent decree unduly burdens one class or another.
 
 
 32
 If the judge feels unable to make this determination without additional information, he may, in his discretion, hold whatever hearings he deems necessary to garner that information. But, the judge must inform the parties who have proposed the decree of his precise concerns, and lend every possible assistance to reach a reasonable accommodation. Only if it clearly appears that the proposed settlement cannot be modified to meet the standard set out above should he refuse to grant his approval, and then he must clearly articulate for our review his reasons for disapproval.
 
 
 33
 When the remedy that is jointly proposed by these parties is within reasonable bounds and is not illegal, unconstitutional, or against public policy, the courts should give it a chance to work. The trial court retains the power to modify or vacate the decree if it later appears to have been unwise.[22] At a later point, experience operating under the decree may prove that it did unjustly burden one group or another. However, if the trial court can simply say that, without a full-blown trial of the facts, he cannot make a positive determination that the proposed decree is fair and equitable, and can therefore refuse to sign it, the goal of a society with equal opportunity for all will be needlessly delayed. The expense to all sides of a full blown trial can be enormous. If the resources of government agencies charged with enforcing anti-discrimination laws must be expended in the trial of complex factual issues in every case, the progress of remedying illegal discrimination is likely to slow to a snail's pace.[23] This result would be entirely contrary to the goals of Title VII.[24]
 
 
 34
 The trial court may only rely on whatever record he has before him when the settlement is proposed; if nothing appears to make him believe the settlement is unreasonable, illegal, unconstitutional, or against public policy, he should grant his approval. If he cannot approve the settlement, he should explain his objections to the parties to give them a chance to meet them. When objections to the settlement are presented, they should be carefully considered. See E.E.O.C. v. American Telephone & Telegraph Co., 556 F.2d 167, 178 (3d Cir. 1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). However, the burden must be on the objectant to convince the court to disapprove the proposed settlement, and the trial court's reasoned approval of the settlement will be entitled to much difference. Otherwise, the policy of voluntary compliance with Title VII could be severely thwarted by the interposition of objections to the settlement.
 
 B. Appellate Review
 
 35
 It has often been stated that the standard for appellate review of a trial court's approval of a proposed settlement is "abuse of discretion." Usually it is said that the settlement will be reversed on appeal only if it clearly appears that the trial court abused its discretion in approving the settlement. See, e. g., Dawson v. Pastrick, 600 F.2d 70 (7th Cir. 1979); Cotton, supra; Allegheny-Ludlum, supra, 517 F.2d at 850; City of Detroit v. Grinnel Corp., 495 F.2d 448, 455 (2d Cir. 1974); Young v. Katz, 447 F.2d 431 (5th Cir. 1971). These and similar cases contain no analysis of how the "abuse of discretion" standard on appeal relates to and interacts with the standard for approval at the trial level; rather, the abuse of discretion standard has allowed appellate courts to affirm the trial court's decision to approve a settlement without requiring the appellate court to undertake a detailed inquiry into the reasonableness of the settlement.
 
 
 36
 In general, this deference to a trial court's decision to approve a proposed settlement is appropriate. Settlement of lawsuits by agreement has always been favored.[25] Trial courts generally have a greater familiarity with the factual issues and legal arguments in the lawsuit, and therefore can make an evaluation of the likely outcome were the lawsuit to be fully tried. It is against this evaluation that a trial court can determine the reasonableness of a settlement. Without this familiarity, the appellate court necessarily must defer to the trial court's judgment.
 
 
 37
 However, the degree of deference should depend on the degree to which the reasons for deference apply. In the instant case, the trial court was deeply involved in considering the merits of the arguments of both sides. The trial court not only once vacated the decree upon the request of FOP, but also became involved in later modifications before the decree was re-entered. Considerations such as the expertise and experience of counsel for the various parties and the reasonableness of their positions and arguments were undoubtedly present in the mind of the trial judge when he approved the settlement. These factors weigh in our minds as we consider the settlement on review.
 
 
 38
 However, the abuse of discretion standard cannot be used as a rubber stamp to approve all settlements, especially in cases involving the important issues here involved. We must address the FOP's substantive challenge to the legality of the terms of the consent. It is to this that we now turn.
 
 III.
 
 39
 The FOP's major challenge is that the decree impermissibly awards retroactive seniority to blacks, Latins, and women, in violation of § 703(h) of Title VII, 42 U.S.C. § 2000e-2(h). Additionally, it asserts that the use of percentage goals for hiring and promotion in the consent decree requires its reversal. Because we feel that the latter issue is of paramount importance, we address it first.
 
 A. Goals and Targets
 
 40
 FOP makes a broad attack on the use of hiring and promotional goals in the consent decree, relying on Title VII and the Fourteenth Amendment to the Constitution. The attack appears to be concentrated on the use of percentage goals or targets per se, although their appropriateness and reasonableness in this particular case are also questioned.
 
 1. Per Se Attack
 
 41
 At this point in the history of the fight against discrimination, it cannot be seriously argued that there is any insurmountable barrier to the use of goals or quotas[26] to eradicate the effects of past discrimination. See Detroit Police Officers' Association v. Young, 608 F.2d 671 (6th Cir. 1979); Davis v. County of Los Angeles, 566 F.2d 1334 (9th Cir. 1977), vacated as moot, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); United States v. City of Chicago, 549 F.2d 415 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); Rios v. Enterprise Association Steamfitters Local 638, 501 F.2d 622 (2d Cir. 1974); United States v. Masonry Contractors Association of Memphis, Inc., 497 F.2d 871 (6th Cir. 1974); Franks v. Bowman Transp. Co., 495 F.2d 398 (5th Cir. 1974), modified, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Morrow v. Crisler, 491 F.2d 1053 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); Vulcan Society v. Civil Service Commission of the City of New York, 490 F.2d 387 (2d Cir. 1973); Associated General Contractors of Massachusetts, Inc. v. Altshuler, 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (en banc) (per curiam); United States v. Local Union No. 212, 472 F.2d 634 (6th Cir. 1973); United States v. Wood, Wire and Metal Lathers International Union, Local Union No. 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); United States v. United Brotherhood of Carpenters and Joiners of America, Local 169, 457 F.2d 210 (7th Cir.), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); United States v. International Brotherhood of Electrical Workers, Local No. 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Local 53 of the International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969). To the contrary, affirmative relief is required to ensure that the effects of past discrimination are negated. In Morrow, supra, this court held, en banc, that a decree which resulted in an increase in the number of black patrolmen on the Mississippi Highway Patrol from four to six was insufficient. We insisted that the District Court fashion an appropriate decree which would have the certain result of increasing the number of blacks on the Highway Patrol. We suggested to the District Court several of the various forms of affirmative relief which might be appropriate: hiring ratios, hiring pools, or a freeze on white hiring. We recognized the need for the plaintiffs and defendants to fully cooperate with each other and with the District Court.
 
 
 42
 No decision of the Supreme Court has ever adopted the proposition that the Constitution must be color blind. See Bakke, supra, 438 U.S. at 336, 98 S.Ct. at 2772 (opinion of Justice Brennan). The Supreme Court has unanimously rejected a statute mandating color blindness on the ground that it would prevent District Courts from fashioning appropriate decrees. See North Carolina Board of Education v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 1285, 28 L.Ed.2d 586 (1971). "Race must be considered," the Supreme Court said. Id. at 46, 91 S.Ct. at 1286. Race-conscious plans have also been approved by the Supreme Court in, for example, United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1971); and Green v. New Kent County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
 
 
 43
 Thus, unless the Supreme Court's decision in Bakke spells the doom of the use of racial and sexual goals by municipal employers,[27] prior precedent compels us to conclude that hiring and promotional goals are not per se unconstitutional, illegal, or against public policy.
 
 
 44
 We frankly admit that we are not entirely sure what to make of the various Bakke opinions. In over one hundred and fifty pages of United States Reports, the Justices have told us mainly that they have agreed to disagree. In addition, we now know that Mr. Bakke must be admitted to the Medical School at the University of California at Davis, but that this does not mean that all affirmative action is doomed. If we wished to delay voluntary efforts by municipal employers to achieve equality of employment opportunity for all persons regardless of race, national origin, or sex, we would have no trouble finding language in the opinion of Mr. Justice Powell supporting the position that, as a constitutional matter, race cannot be used as a factor in a selection process unless constitutional or statutory violations have been proved. See Bakke, supra, 98 S.Ct. at 2755, 2757, 2758 (opinion of Justice Powell). However, this was the view of Justice Powell alone; the four Justices who agreed with his result in the case found it unnecessary to reach the constitutional issue. Moreover, we read his opinion to deny that specific findings of past illegal conduct are constitutionally required before a public employer can base decisions on race.
 
 
 45
 First, Mr. Justice Powell states explicitly that the decision "does not call into question congressionally authorized administrative actions, such as consent decrees under Title VII." 98 S.Ct. at 2755 n.41 (emphasis added). Not only is the factual situation in employment discrimination cases materially different from that involved in Bakke, see id. at 2754, but also there has been detailed legislative consideration of the various indicia of previous constitutional or statutory violations, id. at 2755 n.41, particular administrative bodies have been charged with detecting violations and formulating remedies, id., and there is a legislative mandate to remove barriers to equality of employment opportunities. Id. at 2758.[28]
 
 
 46
 Moreover, the opinion of Justice Powell suggests that the Congressional findings of discrimination in employment accompanying the passage of Title VII are sufficient to justify race-conscious remedies. See Bakke, supra, 98 S.Ct. at 2758 n.44 (opinion of Justice Powell). This conclusion is supported by Mr. Justice Powell's citation with approval of two cases involving affirmative action remedies imposed under Executive Order 11,246, 3 C.F.R. 339 (1964-1965 Compilation), reprinted following 42 U.S.C.A. § 2000e at 281 (West 1974), without detailed findings of past discrimination. See Bakke, supra, 98 S.Ct. at 2754-55 (opinion of Justice Powell), citing Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Associated General Contractors of Massachusetts, Inc. v. Altschuler, 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974). In neither of these cases were detailed findings of past discrimination by the employer relied on to support the affirmative action plan; rather, the remedies were based on underutilization of minorities by labor organizations and the general findings supporting the Executive Order. In neither case were there findings of specific instances of identified past discrimination.
 
 
 47
 In the instant case, the Department of Justice made a determination, based on its investigation of the employment practices of the City of Miami, that there was a pattern and practice of discriminatory employment practices in the City of Miami.[29] By signing the consent decree, the Department of Justice gave its administrative approval to the remedy chosen. Nothing more is constitutionally required by the opinion of Mr. Justice Powell. To conclude otherwise would require parties in agreement over a proposed remedial plan to put on a trial neither desires to convince a judge to approve their proposed plan.
 
 
 48
 It is clear that, under the views of the other four Justices[30] who reached the constitutional issue, the only possible obstacle to affirmative relief of the type here proposed would be a determination that the specific plan is unreasonable. See Bakke, supra, 98 S.Ct. at 2792 (opinion of Justice Brennan).[31] They correctly prognosticated the precise problem we face today:
 
 
 49
 Indeed, the requirement of a judicial determination of a constitutional or statutory violation as a predicate for race-conscious remedial actions would be self-defeating. Such a requirement would severely undermine efforts to achieve voluntary compliance with the requirements of law. And, our society and jurisprudence have always stressed the value of voluntary efforts to further the objectives of the law. Judicial intervention is a last resort to achieve cessation of illegal conduct or the remedying of its effects rather than a prerequisite to action.
 
 
 50
 Bakke, supra, 98 S.Ct. at 2786 (opinion of Justice Brennan).
 
 
 51
 Moreover, Justice Brennan noted that "the presence or absence of past discrimination is largely irrelevant to resolving respondent's constitutional claims," id. at 2787, because the whites and males affected by affirmative action are innocent of past discrimination. Thus, while it may be fair to "punish" an employer or educational institution by interfering with its free selection processes only if it has been guilty of past discrimination, the wrongdoing of the institution is largely unrelated to the expectations of nonminority workers or applicants.
 
 
 52
 We thus conclude that at least under the views of the five Justices who reached the constitutional issue in Bakke, the consent decree here is constitutional so long as the remedy was reasonable. To that question we now turn.
 
 2. Reasonableness
 
 53
 A stipulation was entered between the United States and the City of Miami concerning the statistical composition of the workforce of the City of Miami on September 2, 1976. It was presented to the district court along with the joint motion of the City and the United States seeking re-entry of the consent decree. The FOP has not challenged the stipulated statistics.
 
 
 54
 These statistics show that of the 911 black males employed by the City on September 2, 1976, 680 just less than 75%, were employed as maintenance workers. For white males, the corresponding figure was 10%. Conversely, the job categories official/administrative, professionals, technicians, and protective service collectively employed almost 79% of the white male city workers, but only about 15% of the black employees. This disparity in job categories was directly reflected in a striking disparity in earnings between white and black males. Approximately 53.4% of the white males employed by the City earned an annual salary in excess of $16,000, as compared to 6.8% of the black males. Fully 64% of the black males earned less than $13,000 per year; only 17.2% of the white males earned salaries in this range.
 
 
 55
 The statistics speak just as plainly for female and Spanish-surnamed employees. The labor force in Miami is 46.9% Spanish-surnamed, but this category makes up only about 11% of City employees. For women, the corresponding figures are 44% and 16%. Only 17.4% of Spanish-surnamed males employed by the City and only 7% of the females, earned more than $16,000 per year (compared to 53.4% of the white males).
 
 
 56
 These statistics present an overwhelming prima facie case of discriminatory employment practices.[32] See, e. g., Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In Teamsters, the Supreme Court explicitly stated that statistics are competent in proving employment discrimination. Id., 97 S.Ct. at 1856.
 
 
 57
 Of course, statistics do not tell the whole story. There may well be an explanation other than intentional racial or sexual discrimination for some or all of these statistical disparities. But, as the Supreme Court has recently pointed out, statistics showing racial or ethnic imbalance are "often a tell-tale sign of purposeful discrimination; absent explanation, it is ordinarily expected that nondiscriminatory hiring practices will in time result in a workforce more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." Teamsters, 97 S.Ct. at 1857 n.20.
 
 
 58
 The hiring and promotional goals established by the decree are substantially related to ending the long-standing pattern of discrimination evidenced by these statistics. The ultimate goal is to obtain percentages of blacks, Spanish-surnamed individuals, and women generally consistent with their percentages in the community. The interim entry level goals appear to be set below those levels,[33] presumably reflecting the parties' belief that for the immediate future there may be an inadequate supply of qualified minority and female applicants. Black, Latin, and female employees who were initially assigned to jobs traditionally assigned to members of those groups are given preference in filling vacancies in the City workforce, but these rights are limited so as not to unnecessarily trammel the opportunities of white male employees.[34]
 
 
 59
 The consent decree explicitly provides that "(i)n no event shall the City be required to hire unnecessary personnel, to hire, transfer or promote a person who is not qualified, or to hire, transfer or promote a less qualified person, in preference to a better qualified person, consistent with the provisions of this decree." The major exception to this provision is that members of the affected class who are the most senior applicants for vacant positions are given preference over persons not members of the affected class, unless the non-member "has demonstrably superior qualifications." These provisions appear to us to be entirely reasonable. The members of the affected class (identified victims of discrimination, blacks and Latins who were initially assigned to traditionally black or Latin jobs, and women who were initially assigned to traditionally female jobs) are precisely those who were, or are members of the class most likely to have been, victims of discrimination. The preference is limited to one successful promotion or transfer, a preference that might still leave some victims of discrimination behind their "rightful places."
 
 
 60
 Moreover, the affirmative relief is temporary. The trial court retains jurisdiction to make other appropriate orders. When the objectives of the decree have been met, it will be dissolved. In the interim, if any provisions of the decree prove to be unduly burdensome to non-minority workers, the court can make whatever adjustments are necessary.
 
 
 61
 Therefore, because we find the goals established to be substantially related to the legitimate goal of ending the long-standing pattern or practice of discrimination alleged by the United States, because the plan does not require the promotion of unqualified persons, because the plan does not unnecessarily trammel the interests of white male employees or act as an absolute bar to their advancement, and because it is temporary, we can easily find that it is a reasonable effort at a solution to a difficult problem.
 
 B. Retroactive Seniority
 
 62
 FOP also claims that the consent decree impermissibly awards retroactive seniority to blacks, Latins, and women. This assertion widely misses the mark on two counts. First, the consent decree does not award any retroactive seniority at all; it states merely that "(t)he City shall compute the seniority of each member of the affected class based on the total seniority of that person with the City." This approach to seniority has nothing fictional or retroactive about it, as each employee is given seniority credit for the time he was employed by the City.
 
 
 63
 Second, FOP's argument that retroactive seniority is impermissible is based on International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), which is at most peripherally relevant to the fact situation here. In Teamsters, the Court held that § 703(h) of Title VII, 42 U.S.C. § 2000e-2(h),[35] immunizes from attack under Title VII otherwise bona fide seniority systems that afford no constructive seniority to victims discriminated against prior to the effective date of Title VII. 97 S.Ct. at 1861. Here, the seniority system was not imposed by the court over the objection of the employer, but it was voluntarily agreed to by the employer.[36] To say that a seniority system is immunized from attack means that the employer cannot be forced against its will to modify the system, not that the employer cannot agree to change it.
 
 
 64
 Here, as in Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), there can be no argument that the seniority system imposed by the decree in any way deprives other employees of indefeasibly vested rights conferred by the employment contract. See Franks, 96 S.Ct. at 1271. Just as a collective bargaining agreement may, for the purpose of furthering public policy interests beyond what is required by statute, enhance the seniority status of certain employees even though to some extent this will be detrimental to the expectations of other employees, Franks, supra,[37] so may an employer voluntarily consent to changes in seniority provisions that do not abridge contractual, statutory, or constitutional rights of its employees or their bargaining agent to further important public policy interests.[38] Indeed, at least one district court has gone further, and held that an affirmative action compliance agreement negotiated between a federal agency and an employer relieves the employer of its obligation under a collective bargaining agreement to arbitrate grievances concerning employee layoffs, when the procedure for choosing which employees to lay off was mandated by the compliance agreement. See Savannah Printing Specialties & Paper Products Local 604 v. Union Camp Corp., 350 F.Supp. 632 (S.D.Ga.1972).
 
 
 65
 Although City of Miami employees may subjectively have expected the City to continue to use the criteria for promotion it had used prior to the consent decree, the FOP has been unable to articulate any doctrine which would demonstrate that this subjective expectation was protected by Florida law. It merely baldly concludes that "the old promotional system gave employees a vested right to expect to be promoted if they qualified under its guidelines . . . ." Reply Brief for Appellant FOP at 6. Given the complete absence of any support for this assertion, we doubt its validity.
 
 
 66
 However, we need not stop to conduct a detailed inquiry, since we do not believe analysis along this line would be helpful in determining whether the consent decree is legal under Title VII. It is undoubtedly true that even expectancies characterized as "vested rights" under state law must fall before a court adjudication that Title VII mandates that the expectancies not be fulfilled. See, Franks, supra, 96 S.Ct. at 1268-69; United States v. Hayes International Corp., 456 F.2d 112, 118 (5th Cir. 1972). Thus, even if "vested," the rights would not be absolute. Because of Title VII's emphasis on voluntary compliance, see p. 1331, supra, we believe it equally true that such expectancies, even if "vested" for some purposes,[39] are not protected against voluntary affirmative action programs which are otherwise valid. The primary focus must be on the reasonableness of the affirmative action plan in the particular circumstances of the employer, as discussed supra pp. 1338-1340, and we must not allow ourselves to be distracted by attempts to characterize it as an interference with vested rights.
 
 IV.
 
 67
 In a conventional two-party lawsuit, one party wins and the other loses. Although the resolution of the legal issues may be difficult and have consequences far beyond the parties, no one other than the parties is directly affected by the decree. The situation here is entirely different. Whatever the court does, or does not do, will affect all employees in the workforce of the City of Miami. Some will be benefited; others, hurt. Few would today disagree with the mandate of Congress that something must be done to ensure that discrimination does not prevent minorities and women from receiving their fair share of the economic opportunities available. Reasonable persons, however, have disagreed and will disagree vehemently over how best to accomplish this.
 
 
 68
 As we see it, the best hope is provided by negotiation and compromise among all affected persons and parties. Where minorities and women have been underrepresented in the past, non-minority males, even those innocent of any wrongdoing, must temporarily bear some of the burden. Understandably, they will be unhappy with this necessity. Conversely, minorities and women may feel that the opportunities foreclosed to them for years are not adequately made up by temporary limited preferences. With these competing interests, the employer's interest in making its own employment decisions, government agencies' interests in eradicating discrimination in employment and the effects of past discrimination, and the predictions and predispositions of trial courts concerning these matters all weighed together, it is unlikely that all involved will be completely happy with any result. But this is the nature of compromise. The alternative is to insist that the parties put on a costly and lengthy trial, after which the district court still must face the troubling question of how much of a burden non-minority males must bear so that minorities and women can gain equality of opportunity.
 
 
 69
 In the resolution of this balance, an agreement between the Justice Department and the concerned municipal governments must be given much weight, within a wide range of reasonableness. Other interested parties, such as the FOP here, should be given every opportunity to demonstrate that the agreement unduly burdens the interests of white employees, and to propose alternatives which are less burdensome. The district court gave the FOP every opportunity, and it was not convinced; we too have considered FOP's complaints, and neither are we convinced. Therefore, the district court's approval of the consent decree is AFFIRMED, and the cause is REMANDED to the district court for his exercise of the retained supervisory jurisdiction over compliance with and possible modifications in the decree.
 
 APPENDIX
 CONSENT DECREE
 
 70
 The plaintiff United States of America has filed its complaint in this action against the City of Miami alleging that the defendants are engaged in a pattern and practice of discrimination in employment on the basis of race, sex and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972 (Pub. L. 92-261, March 24, 1972); the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3766, as amended, and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221 et seq.
 
 
 71
 The Court has jurisdiction over the parties and the subject matter of this action.
 
 
 72
 The parties have waived hearing and the entry of findings of fact and conclusions of law on all issues covered by this Consent Decree, and have agreed to the entry of this decree which shall not constitute an adjudication or an admission by any of the defendants of any violation of law.
 
 
 73
 The plaintiff recognizes the adoption by the City Commission of the City of Miami of Resolutions No. 75-636 and 75-958 and Motion No. 75-727 as evidence of good faith efforts by the City of Miami to take affirmative action to increase minority and female participation throughout the City's work force.
 
 
 74
 It is therefore ORDERED, ADJUDGED AND DECREED as follows:
 
 
 75
 1. The defendant City of Miami, its officials, agents, employees, and all persons in active concert or participation with them in the performance of City functions (hereinafter collectively referred to as the City) are permanently enjoined and restrained from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the City of Miami because of such individual's race, color, sex or national origin. Specifically, the City shall not fail or refuse to hire, promote, upgrade, train or assign any individual, discharge any individual or otherwise discriminate against any individual as an employee or applicant for employment with respect to compensation, terms, conditions or privileges of employment because of race, color, sex or national origin.
 
 
 76
 In no event shall the City be required to hire unnecessary personnel, to hire, transfer or promote a person who is not qualified, or to hire, transfer or promote a less qualified person, in preference to a better qualified person, consistent with the provisions of this decree.
 
 2. Recruitment
 
 77
 a. The City shall continue to develop and reassess its present affirmative recruitment program designed to inform blacks, Latins and women of job opportunities with the City, for the purpose of securing sufficient qualified applicants to enable the City to meet the hiring goals set forth herein. The recruitment program shall include maintaining contacts with area high schools, technical and vocational schools, colleges, and organizations which have traditionally expressed an interest in providing minority and female applicants or which indicate such interest in the future, and informing them of employment opportunities for City residents. In addition, where appropriate, advertising of employment opportunities shall be placed in radio stations and other mass media primarily directed to black, Latin and female audiences for the purpose of emphasizing to minorities and women the availability of employment positions. It is understood that the present recruiting area is the city limits of the City of Miami, and such schools, organizations and media utilized shall be consistent with this policy.
 
 
 78
 In the event it is determined by the City (by its Civil Service Board) that recruiting solely within the City of Miami fails to produce sufficient qualified applicants or is not productive of results as envisioned in this decree, the recruiting area may be enlarged to include Dade County. In the event the recruiting area is enlarged, persons on civil service registers who do not reside in the City of Miami will be considered for employment only after there are no City residents remaining on the register.
 
 
 79
 b. Police Department. The City shall operate the Law Enforcement Community Outreach and Career Program (the Tri-Cultural Program) as long as federal grant funds continue to be made available for that purpose. The City will continue to make applications for grant funds for the Tri-Cultural Program. In the event such federal funds are discontinued the City shall develop a police officer recruiting program of a similar nature and shall submit it to the plaintiff for approval prior to its commencement, provided that approval will be assumed if no reply is received within 30 days.
 
 
 80
 c. Fire Department. The City shall continue to pursue an active program to recruit blacks, Latins, and women who meet the requirements to become firefighters. Workers in City departments shall be included in the recruiting program.
 
 
 81
 In such recruiting program the City may continue to cooperate with the International Association of Firefighters Labor Recruitment Program, and Miami Firefighters Association No. 587, if such organizations exhibit a continued willingness to engage in such cooperation.
 
 
 82
 The City, through the International Association of Firefighters Labor Recruitment Program, shall also provide assistance to applicants to prepare for both written and physical tests and for oral interviews, as well as orientation to assist applicants in the Fire College training program required for entrance of firefighters upon employment.
 
 
 83
 The City shall provide sufficient information on test content at least three months in advance of the expected examination date to enable such organizations to develop and implement an adequate training program.
 
 
 84
 The City understands that this program will supplement the normal selection process, for the period of this Decree. The City shall seek to select 30% of new appointments from among those applicants who participated in the minority recruitment and training program, if sufficient qualified applicants are obtained by this means. This paragraph is to be consistent with those goals established for the fire department in paragraph 5 of this decree.
 
 
 85
 In the event the International Association of Firefighters recruitment program is discontinued and the Firefighters Association No. 587 is no longer able or willing to cooperate in the recruitment program for the Fire Department, the City shall develop a similar firefighter recruitment program and shall submit it to the plaintiff with the next report required under this decree.
 
 3. Selection Procedures
 
 86
 Except as otherwise provided in this decree, the City shall consider applications for employment from any person who meets the current criteria for any given position, without regard to such person's race, color, sex or national origin, provided, however, that no standards shall be applied to exclude blacks, Latins and women which are not also applied to disqualify white Anglo males. Specifically:
 
 
 87
 (a) Testing Requirements
 
 
 88
 The City shall not use any written examination for employment or promotion which has an adverse impact on blacks, Latins or women unless it can be shown to be predictive of successful job performance, or can otherwise be shown to be job related, in accordance with standards established by the Equal Employment Opportunity Commission in its Guidelines on Employee Selection Procedures, 29 CFR § 1607 et seq., except that:
 
 
 89
 (1) The City may continue to use such tests during the time they are being validated in accordance with the EEOC Guidelines, and the use of such tests will not be considered a defense against failure to meet the goals set forth in paragraph 5 below.
 
 
 90
 (2) The City may continue to use skill tests of actual job content (for example typing and filing).
 
 
 91
 (3) The City shall continue to provide exams in Spanish for positions which do not require proficiency in English.
 
 
 92
 (4) Nothing in this paragraph shall prevent the administration of tests on a research basis during the term of this decree, provided the results of such tests are not used in any manner in hiring, promotion or transfer decisions or in the evaluation or personnel, and the scores and/or relative performance of the persons tested are not made known to any individuals other than those directly involved in the analysis of the test.
 
 
 93
 (b) Education Requirements
 
 
 94
 The City shall continue to review job descriptions for the purpose of evaluating the need for a high school diploma or equivalency certificate, or an associate or bachelor's degree, as a general qualification for employment. The City shall discontinue the use of an education requirement for any position for which such a degree or diploma is unnecessary and where the continued use of such a standard will have the effect of disqualifying blacks, Latins or women at higher rates than white Anglo males. The results of such review shall be submitted to counsel for plaintiff along with the first report required under this decree.
 
 
 95
 (c) Background Investigation
 
 
 96
 The background investigation shall not include, nor shall any black, Latin or woman be rejected for employment on the basis of, any inquiry which is not routinely made about white Anglo males.
 
 
 97
 (d) Personal (Pre-Employment) Interview
 
 
 98
 No personal (pre-employment) interview (including police oral review board) conducted with respect to women, blacks and Latins shall include, nor shall any woman, black or Latin be rejected for employment on the basis of, any inquiry which is not routinely made of white Anglo males.
 
 
 99
 (e) Medical Examination
 
 
 100
 The medical or physical examination required of all applicants shall be the same for all applicants, in accordance with job requirements. Whenever an applicant believes s/he has been erroneously disqualified on the basis of the medical or physical examination, s/he shall be given the opportunity to secure an additional diagnosis, at the applicant's expense, from two independent physicians agreed upon between the City and the applicant. Should the physicians agree that the applicant is qualified according to regularly established physical standards, such evidence of fitness shall entitle the applicant to be considered for employment, in the absence of any other disqualifying factor.
 
 
 101
 (f) Physiological Qualifications
 
 
 102
 The physiological qualifications applied to any position shall not include any standards which operate disproportionately to exclude blacks, Latins or women and which have not been shown to be valid or otherwise demonstrably job-related in accordance with standards established by the Equal Employment Opportunity Commission in its Guidelines on Employee Selection Procedures, 29 CFR 1607 et seq. Any test of physical agility required to be completed in order to qualify for appointment to any City position, particularly to entry level positions in the Police and Fire Departments, shall be administered to blacks, Latins and women in the same manner and under the same conditions as such tests are administered to white Anglo males.
 
 
 103
 (g) Police and Fire Departments
 
 
 104
 For purposes of the fire department the requirements of state firefighters standards council shall apply. For purposes of the police department, the standards of the Police Standards and Training Commission of Florida shall apply. Should such state standards change or be modified in apparent disagreement with federal law, such changes shall be discussed by the parties.
 
 
 105
 (i) Criminal Record
 
 
 106
 Applicants for employment shall not be disqualified solely on the basis of an arrest record.
 
 
 107
 A record of criminal conviction may be used to reject an applicant for the position of police officer only if the applicant has been convicted of a felony or of a misdemeanor involving "moral turpitude" as the term is defined by law or if the applicant has been released or discharged under any other than honorable conditions from any of the armed forces of the United States.
 
 
 108
 An applicant for the position of fire fighter who has been convicted of a felony may be excluded from consideration for employment for a period of four years after expiration of sentence or final release by the parole and probation commission unless the applicant, prior to the expiration of the four-year period, has received a full pardon or has had his/her civil rights restored.
 
 
 109
 The above provisions shall not be construed to prevent consideration of an arrest record with respect to the qualifications of an applicant where arrests have resulted in indictments or informations against an individual and where these indictments or informations are for felonies or misdemeanors involving moral turpitude even though there is no actual conviction.
 
 
 110
 (ii) Polygraph Examination
 
 
 111
 A polygraph examination (lie detector test) may be administered only to applicants for positions requiring bonding and positions of trust or security. No questions shall be asked of black, Latin or female applicants which are not also regularly asked of white Anglo male applicants, and in no event shall an applicant be asked any questions which are not directly job-related. Under no circumstances shall the polygraph be used as the sole disqualifying factor in the screening of any applicant. The polygraph examination shall be administered to black, Latin and female applicants on the same terms and under the same conditions as those applied to white Anglo male applicants.
 
 
 112
 (iii) Minimum Age
 
 
 113
 Any applicant who shall have reached the age of 18 shall be eligible for appointment as a firefighter or a public service aide.
 
 
 114
 (iv) Police Academy and Fire College
 
 
 115
 Training for entry level police officers and firefighters shall be administered to blacks, Latins and women on the same terms and under the same conditions as such training is administered to white Anglo males.
 
 4. Assignment
 
 116
 a. The City shall not discriminate on the basis of race, sex or national origin in the assignment of employees in any department, except as may be consistent with standards established by the Equal Employment Opportunity Commission in its Guidelines on Discrimination Because of Sex, 29 CFR 1604 et seq., and its Guidelines on Discrimination Because of National Origin, 29 CFR 1606 et seq.; and by the Office of Revenue Sharing of the U.S. Department of Treasury in Section 51.54 of its Rules and Regulations, 31 CFR Part 51.
 
 
 117
 b. Sanitation Department
 
 
 118
 The City agrees to establish lines of progression within the Waste Collection Division of the Sanitation Department as follows:
 
 
 119
 A list of stand-by laborers will be established who will be offered employment on a daily basis to fill positions held by probationary or permanent waste collectors who are absent on their assigned work day.
 
 
 120
 As vacancies occur in the waste collectors classification, the department director shall select, with the assistance of the Sanitation Employees Association Committee, a replacement from the established list of stand-by laborers.
 
 
 121
 The City will train qualified waste collectors in the operator operations of the desired type of equipment utilized by waste collector I. Vacancies in the classification of waste collector operator I shall be filled by the selection of one of such trained personnel by the department director, with the assistance of the Sanitation Employees Association Committee.
 
 
 122
 The City shall offer training in the operation of the equipment utilized in the next higher classification and repeated throughout the equipment operations series.
 
 
 123
 The lines of progression following that shown above shall be:WASTE COLLECTOR OPERATOR II
 
 WASTE EQUIPMENT OPERATOR
 
 124
 The City further agrees that the classification of sanitation foreman and sanitation inspector I will be filled from existing permanent employees within the Sanitation Department in accordance with the goals established herein for blacks, Latins and women.
 
 
 125
 c. Police Department
 
 
 126
 The City shall evaluate its time in grade and performance evaluation requirements for promotion and for assignment to positions other than police officer and shall develop time in grade and performance evaluation standards which do not have the effect of selecting white Anglo males at a higher rate than blacks, Latins or women. Such selection process shall be consistent with the goals and timetables set forth in this decree for promotion. A review of this paragraph shall be made at any time upon the election of either party.
 
 5. Goals
 
 127
 In order to eliminate the effects of past discriminatory practices against blacks, Latins and women, the City shall adopt and seek to achieve as its long term goal the participation at all levels throughout its work force of blacks, Latins and women approximating their respective proportions in the City's labor force, as determined by the United States Bureau of the Census. The purpose of this goal is to eliminate the substantial underrepresentation and uneven distribution of blacks, Latins and women throughout the City's work force.
 
 
 128
 (a) Hiring
 
 
 129
 In order to achieve this long term goal, subject to the availability of qualified applicants, the following recruitment and hiring goals shall be established for blacks, Latins and women (blacks and Latins are referred to collectively in this paragraph 5 as minorities). It is understood that the goals are minimums, and that the City shall seek to fulfill the goals by hiring blacks, Latins and women generally in proportion to their representation in the labor force. Only full time regular civil service employees who have successfully completed their probationary period, or, in the case of the Police and Fire Departments, those who successfully complete the police academy or fire college, shall be counted in determining progress toward the goals. Progress toward these goals shall be measured on an annual basis.
 
 
 130
 (1) For each entry level position of police officer, public service aide, fire fighter and traditionally white Anglo male positions in the Departments of Finance and Building, the goal shall be 56% minorities and women each year. For purposes of this subparagraph, traditionally white Anglo male positions shall include such positions as building inspector, zoning inspector and skilled trades.
 
 
 131
 (2) For each traditionally black entry level service and maintenance position in the Departments of Sanitation and Public Works, the goal shall be 35% other than black each year. For purposes of this subparagraph, traditionally black entry level service and maintenance positions shall include such positions as laborers and waste collectors.
 
 
 132
 (3) For each entry level skilled craft, technical and lower level administrative position throughout the City, the goal shall be 50% minorities and women each year. For purposes of this subparagraph, skilled craft positions shall include such positions as mechanic (including automotive, air condition and heavy equipment mechanic), carpenter, electrician, lineman, machinist, painter, pipefitter, plumber and welder; technical positions shall include such positions as engineering, identification and planning technicians; and lower level administrative positions shall include white collar nontechnical positions such as administrative aide, clerk, secretary, keypunch operator.
 
 
 133
 (4) For each entry level paraprofessional position, 40% minorities. For purposes of this paragraph, paraprofessional shall include such positions as foreman, supervisor, computer programmer.
 
 
 134
 (5) For entry level professional positions, the goal shall be 30% minorities and women each year. For purposes of this paragraph, professional shall include such positions as accountant, engineer, manager, architect, publicity writer.
 
 
 135
 (6) For entry level official and upper level administrative positions, the goal shall be 20% minorities and women each year.
 
 
 136
 (b) Promotion
 
 
 137
 Subject to the availability of qualified applicants, promotional goals shall be established for minorities, on a department basis, with each department having as its yearly goal, until the long term goal has been met for a period of one year, either parity with the Miami City workforce population statistics or the percentage of minorities currently employed in the department, whichever is smaller. Priority opportunity for promotion (as defined in paragraph 7(b) below) within a particular department shall be provided to qualified persons who have indicated a desire or interest in the promotion, transfer and assignment opportunities created by this decree. Each person responding to this request shall be promoted or transferred pursuant to the provisions of paragraph 7 below.
 
 6. Affected Class
 
 138
 The term "affected class", as used in this decree, shall include the following:
 
 
 139
 (a) All incumbent black and Latin employees currently holding positions with the City who were initially assigned to traditionally black or Latin jobs.
 
 
 140
 (b) All incumbent women employees currently holding positions with the City who were initially assigned to traditionally female jobs.
 
 
 141
 (c) All blacks, Latins and women identified as having been discriminatorily denied employment opportunities (including promotion and terms and conditions of employment), or terminated since March 24, 1972.
 
 7. Promotion and/or Transfer Pool
 
 142
 (a) The City shall compute the seniority of each member of the affected class interested in this provision based on the total seniority of that person with the City. The City shall maintain a list of people signing up under the provisions of this paragraph 7.
 
 
 143
 (b) A member of the affected class shall be given the initial opportunity to fill any vacancy in the City where the person is the senior applicant who meets, or could reasonably be expected to meet after an initial probationary period, the minimum qualifications for the position unless an applicant not a member of the affected class has demonstrably superior qualifications. This preference shall be exercised at the written election of the applicant. An affected class member using this preference who successfully completes the probationary period shall at that time be informed that s/he can remain in that position or return to his/her prior position.
 
 
 144
 (c) If no affected class member seeks or is entitled to a vacancy as provided in (b) above, the vacancy shall be filled pursuant to the procedures and goals for hiring set forth in this decree.
 
 
 145
 (d) All members of the affected class shall be notified of the provisions of this decree and specifically of the opportunity to transfer and/or be promoted to other positions either within the same department or in other departments when such vacancies occur and notices to fill them are posted by the Civil Service Board. At least ten (10) days before any such vacancies are to be filled, notices of the vacancies shall be posted at convenient locations in each department or division where members of the affected class are employed. Unclassified positions are exempt from this requirement.
 
 
 146
 (e) No member of the affected class who makes a lateral or downward transfer for the purpose of enhancing promotional opportunities, shall be paid at a lower rate than the rate for the job from which she transferred, including any regular within grade increments s/he would have received had s/he remained on that job. A person utilizing rate retention pursuant to this paragraph who returns or is returned to her/his original job pursuant to subparagraph (b) above, may utilize the right to rate retention on a subsequent transfer, provided, however, that this right to rate retention may not be exercised on more than three occasions. The right to rate retention shall continue until a transferee has reached that level in the new department or line of progression where the rate of pay is equal to or higher than that in the previously held job classification. A transferee shall lose this privilege of rate retention if s/he refuses a promotion in the new line of progression or fails to bid on a higher rate job in the new department for which s/he is eligible.
 
 
 147
 (f) Rights of a member of the affected class under paragraph 7 are limited to (1) one successful promotion or transfer, or (2) three unsuccessful attempts to promote or transfer.
 
 8. Specific Relief
 
 148
 (a) The City shall establish a fund in an amount sufficient to cover its back pay liability under this Decree. The dollar amount, identification of recipients, and terms for acceptance of back pay for affected class members shall be consistent with the provisions of this Decree and shall be determined by negotiations with the United States and the City.
 
 
 149
 (b) Certain persons identified in Paragraph 6(c) of this Decree have charges currently pending before the EEOC which were filed before the entry of this Decree and which allege employment discrimination by the City of Miami.
 
 
 150
 The United States and the City will make a good faith effort to resolve the aforementioned charges within the framework of this Decree.
 
 
 151
 In situations where agreement is reached concerning entitlement to specific relief for any of the aforementioned persons, the names of the persons and the specific relief agreed upon for each shall be submitted to the Court within an appropriate period.
 
 
 152
 In cases of disagreement between the United States and the City concerning resolution of the aforesaid charges, either party may apply to the Court for a resolution of the matter at issue.
 
 
 153
 (c) Nothing in this Decree will be construed as limiting the rights of any individual as provided by Section 706 of Title VII, 42 US Code, Section 2000e-5.
 
 
 154
 (d) Each person entitled to receive back pay or other specific relief pursuant to this Decree shall be offered such back pay or other relief conditioned upon execution of an agreement releasing the City from further liability for relief based on matters covered by this Decree occurring before its effective date. No back pay pursuant to this Decree shall be awarded for promotions or transfers made more than five (5) years after the effective date of this Decree. No person shall be entitled to receive back pay more than once.
 
 9. Record Keeping
 
 155
 The City shall retain during the period of this Decree necessary records to support the implementation of this Decree. These records shall be made available to the Department of Justice for inspection and copying upon written request.
 
 
 156
 The City will maintain the following records:
 
 
 157
 (a) A list of all organizations and schools which are contacted pursuant to Paragraph 2, showing the date that any notice of job opportunity was mailed to them, the position and number of positions to be filled from that notice, and the date through which applications could be received for the job which was advertised, including a summary or compilation of all other recruitment efforts aimed at minorities and women, together with the date of said efforts and the names and positions of defendant's employee who made the contact and the nature of the contact.
 
 
 158
 (b) All written applications and related records for all persons seeking employment with the City, including applications for transfer within or among departments, for a period of three (3) years, and shall include on such applications identifications of the applicant by race, sex and national origin.
 
 
 159
 (c) Pass/fail results by race, national origin and sex for all selection standards administered by the City, except those excluded in paragraph 3(a) of this Decree.
 
 
 160
 (d) All written communications between the City and applicants for both initial entrance, transfer and promotion.
 
 
 161
 (e) Sufficient records on part-time, temporary and seasonal employee to assure accurate and complete reports for these employees as required in paragraph 10(h).
 
 10. Reporting
 
 162
 Within ninety (90) days after the entry of the Decree, and following June 30 and December 31 of each subsequent year during the term of this Decree, the City shall report to the Attorney General (to the attention of Chief, Employment Section, Department of Justice, Washington, D.C. 20530 and of the Compliance Manager, Compliance Division, Office of Revenue Sharing, Department of the Treasury, Washington, D.C. 20226) the following inform:
 
 
 163
 (a) A summary showing the total number of employees by race, sex and national origin in each job classification of the City.
 
 
 164
 (b) The list of members of the promotion pool by department required by paragraph 7(a) of this decree.
 
 
 165
 (c) A report showing the positions for which persons in the affected class have applied, name of the person, the dates of such applications and whether or not such applications were successful. The report should also show any positions which the persons in the affected class have been offered but which they refused, showing both the job offered and the dates thereof.
 
 
 166
 (d) A list of all newly hired employees indicating the name, race, sex, national origin and job classification of each since the last report was filed.
 
 
 167
 (e) A list of all persons, by job classification, to whom promotion has been offered under paragraph 7(b) of this Decree and whether or not that promotion has been accepted.
 
 
 168
 (f) A list of all promotions, name, race, sex, national origin and date of hire of the employee promoted and the date of the promotion.
 
 
 169
 (g) A breakdown of the applicant flow of the City by race, sex and national origin which indicates the number of applicants by race, sex and national origin hired, rejected and pending for each job classification. A person is considered an applicant for this purpose upon filing a formal application when a job is posted and upon meeting the minimum qualifications for the position.
 
 
 170
 (h) Pass/fail results by race, national origin and sex for all selection standards administered by the City, except those excluded in paragraph 3(a) of this decree.
 
 
 171
 (i) A list of part-time employees, to include race, sex, national origin and job classification and term of employment.
 
 11. EEO Officer
 
 172
 Copies of this Decree shall be provided by the Plaintiff to be posted in conspicuous locations within each Department and/or operational unit of City Department. Further, the City shall appoint an EEO officer for the City whose duties shall include:
 
 
 173
 (a) To advise black, Latin and female employees of the terms of this Decree.
 
 
 174
 (b) To receive and investigate complaints of race, sex and national origin discrimination; and to conciliate when appropriate; and
 
 
 175
 (c) To maintain a complete record of all actions taken in pursuit of the duties outlined above, including all correspondence directed to the defendant and/or any investigatory files. The individual appointed as EEO officer shall have his office hours and location posted conspicuously beside the Consent Decree.
 
 
 176
 12. Definitions. For purposes of this decree, the following terms shall have the meanings set forth below.
 
 
 177
 a. Assignment shall include the initial appointment of an employee to a particular department or job classification and the duties and responsibilities of an employee in a job classification.
 
 
 178
 b. Black shall include males only.
 
 
 179
 c. Effective date shall mean the date of entry of this decree.
 
 
 180
 d. Honorable conditions shall mean honorable and general discharges.
 
 
 181
 e. Latin shall mean males of Cuban, Puerto Rican, Mexican or other Latin American origin.
 
 
 182
 f. Promotion shall mean the elevation of an employee to the next job classification in a given job ladder or line of progression.
 
 
 183
 g. Transfer shall mean the lateral movement of an employee from one line of progression to another, either within one department or among departments.
 
 
 184
 h. Women shall include all females, regardless of race or national origin.
 
 13. Jurisdiction
 
 185
 The Court retains jurisdiction of this action for such further orders as may be appropriate. At any time after five years subsequent to the date of the entry of this Consent Order, the City may move the Court upon 45 days notice to the plaintiff for dissolution of this decree, and in considering whether the decree should be dissolved, the Court will take into account whether the City has substantially complied with this decree and whether the basic objectives of the decree have been achieved.
 
 THORNBERRY, Circuit Judge, concurring:
 
 186
 Judge Goldberg's very scholarly opinion, it seems to me, is a fair and excellent accommodation of the very difficult issues presented in this case.
 
 
 187
 I do not agree with Judge Gee's interpretation of the opinion's description of Mr. Justice Brennan's dissent in Bakke, as approving racial quotas for societal discrimination, but I regard it as a part of Judge Goldberg's extraordinarily complete analysis of this difficult and uncertain area.
 
 
 188
 The trend is towards upholding consent decrees as discussed and delineated here. Certainly, we cannot say that the decision is compelled by Supreme Court or Fifth Circuit precedents, but just as emphatically we urge neither is it prohibited by any controlling authority.
 
 
 189
 The dissent very fairly and candidly suggests that Weber may be contributing to this trend. I go further to urge that Weber emphasizes and encourages what we do here today.
 
 
 190
 If we deny approval of the consent decree involved in this case, we place upon the municipality and, more particularly, its taxpayers, the onerous burden of one of two alternatives, (1) admission of past discrimination, which must realistically leave them open to undetermined financial liability, or (2) face a full-blown trial involving time and expense which may result in untold consequences. Congress and the courts of this nation time after time strongly encouraged and emphasized necessity of conciliation and settlement of these types of controversies.
 
 
 191
 Finally, with all deference, I cannot subscribe to the suggestion contained in the dissent that the varying opinions in Bakke can in any way be interpreted as reaching such a "precise position" as to have overruled, sub silentio or otherwise, our opinion in Morrow v. Crisler, 491 F.2d 1053 (5th Cir. 1974) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). Nor can I agree with the comments concerning our supposed return to the doctrine of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).
 
 
 192
 I concur.
 
 GEE, Circuit Judge, dissenting:
 
 193
 The lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society. Now this is to be unlearned and we are told that this is not a matter of fundamental principle but only a matter of whose ox is gored. Those for whom racial equality was demanded are to be more equal than others. Having found support in the Constitution for equality, they now claim support for inequality under the same Constitution. Yet a racial quota derogates the human dignity and individuality of all to whom it is applied; it is invidious in principle as well as in practice. Moreover, it can as easily be turned against those it purports to help. The history of the racial quota is a history of subjugation, not beneficence. Its evil lies not in its name but in its effect; a quota is a divider of society, a creator of castes, and it is all the worse for its racial base, especially in a society desperately striving for an equality that will make race irrelevant.
 
 
 194
 Bickel, The Morality of Consent 133 (1975).
 
 
 195
 Today we direct the approval of an agreement by the City of Miami to institute racial and sexual quotas in hiring and promoting its employees. The agreement, like that recently upheld by the Supreme Court against Title VII attack in United Steelworkers and Kaiser Aluminum v. Weber,[1] is "voluntary": here the employer was inspired to adopt "voluntary" quotas by the Department of Justice, there by the EEOC and the Office of Federal Contract Compliance.[2] Here, as in Weber, there is neither admission to nor finding of the maintenance by the employer of discriminatory employment practices in the past, unless the majority's discussion of statistics at 614 F.2d p. 1338 is meant as such a finding.[3] If it is, the majority has acted on incomplete data, data that ignore, among other things, age differentials among the ethnic groups of which we treat. Country-wide, the median age of Jewish-Americans is 46 years; that of Anglo-Saxons, 34; of Blacks, 22; and of Hispanics, 18.[4] On these figures alone, it would scarcely be surprising to discover in Miami or elsewhere that Blacks and Hispanics had not yet penetrated upper-level management in numbers proportionate to their strength in the general population.
 
 
 196
 Statistics being notoriously slippery tools for amateurs such as we, a word of caution from a professional on our subject may not be amiss:
 
 
 197
 A major nonmoral, nonsocietal variable that is routinely ignored is age. As already noted, median age differences among American ethnic groups range up to decades. The median age of American Indians is only one-half that of Polish-Americans (twenty versus forty); the median age of blacks is a little less than half that of Jews (twenty-two versus forty-six). These differences affect everything from incomes and occupations to unemployment rates, fertility rates, crime rates, and death rates. For example, Cuban-Americans average a higher income than Mexican-Americans, who are a decade younger, but in the same age brackets it is the Mexican-Americans who earn more. Any attempt to explain gross income differences between these two groups in terms of either discrimination by "society" or by their respective "ability" runs into the hard fact that the gross difference is the opposite of the age-specific difference. Similarly, blacks have lower death rates than whites, but this in no way indicates better living conditions or medical care for blacks, much less any ability of blacks to discriminate against whites in these respects. Blacks are simply younger than whites, and younger people have lower death rates than older people; on an age-specific basis, whites have lower death rates than blacks. Age differences also overshadow racial differences in unemployment rates: Blacks in the twenty-four to forty-four-year-old brackets have consistently had lower unemployment rates than whites under twenty every year for decades, even though whites as a group have lower unemployment rates than blacks as a group. In short, the impact of age on statistical data is so great that to compare groups without taking age into account is like comparing apples and oranges. Yet "affirmative action" comparisons of group "representation" almost invariably ignore age differences.
 
 
 198
 T. Sowell, Knowledge & Decisions 257 (1980) (footnotes omitted and emphasis added).
 
 
 199
 Other neutral, statistical variables than age exist as well and are likewise ignored in our oversimplified comparisons.[5] But the addition of this factor alone, group age differentials, belies the conclusion of past race prejudice implied in the majority's confident assertions about "striking disparity in earnings" and statistics that speak "just as plainly for female and Spanish-named employees" as they do for blacks.[6] Partial statistics always speak plainly but rarely, if ever, accurately.
 
 
 200
 But this feature of our decision is not especially remarkable, having as precedent not a few past efforts by us in the statistical line. Nor is our conclusion that Title VII, despite its language,[7] does not outlaw employment discrimination on grounds of race or sex. We could scarcely conclude otherwise, given the Supreme Court's determination in Weber that the spirit of Title VII accords with racial discrimination against whites, so long as it is reasonable in degree. Not these determinations, but another, afford today's opinion its landmark quality.
 
 
 201
 For today's decision sustains preferential treatment of classes based on race and sex, in the form of hiring and promotion quotas, against constitutional attack on 14th amendment grounds. As the opinion makes plain, the program of deliberate class preference that we here command is to be carried out, not in order to redress wrongs to particular individuals to accord any given person a rightful place of which he or she has been deprived or even to redress a discerned historic class discrimination by a particular employer, but to compensate for general societal discrimination in the past. I can ascribe no other meaning to the approving quotation of a portion of Mr. Justice Brennan's minority opinion in Bakke at p. 1338, supra.
 
 
 202
 The majority cites a plethora of cases for the proposition that there is no "insurmountable barrier to the use of goals or quotas to eradicate the effects of past discrimination." See p. 1335 supra (footnote omitted and emphasis added). In none of these cases, however, has any circuit court approved the imposition of racial quotas based on a statistical disparity alone, as the majority does here. The majority correctly points out that this court, sitting en banc, approved racial quotas in Morrow v. Crisler, 491 F.2d 1053 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). We did so, however, only upon the basis of a finding by the trial court[8] that the Mississippi Highway Patrol had "historically engaged in unconstitutional discrimination in the employment of patrolmen," id. at 1055, and that the patrol's existing practices were discriminatory. Id. In fact, we specifically characterized the relief ordered there as intended to "offset the effects of past discrimination." Id. at 1056. Assuming that Morrow retains vitality after Bakke,[9] Morrow surely does not countenance the establishment of quotas on the mere basis of statistical disparities, without more; nor do either of the other cases from this circuit cited by the majority, see Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir. 1974), modified, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (past racial discrimination had been demonstrated); Local 53 of the International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969) (union admitted discrimination). In fact, not one of the cases enumerated by the majority at pp. 1335-1336, supra, approves a quota in the clear absence of any findings of past employment discrimination. I believe that the facts of Morrow represent the minimum threshold showing that must be made in order to support the imposition of racial quotas: namely, pervasive and established history of discriminatory employment practices by a specific employer against a particular class of individuals.
 
 
 203
 To support its quantum constitutional leap, the majority interprets Mr. Justice Powell's opinion in Bakke "to deny that specific findings of past illegal conduct are constitutionally required before a public employer can base decisions on race." Maj. op., supra at p. 1337. This is not so: Mr. Justice Powell's opinion makes clear beyond peradventure that the Supreme Court has "never approved preferential classifications in the absence of prove(n) constitutional or statutory violations." 438 U.S. at 302, 98 S.Ct. at 2755 (footnote omitted and emphasis added). The fact that Justice Powell couched his discussion "in negative terms," maj. op., supra at p. 1337 n.28, cannot obscure the fact that the majority today charts a course that the Supreme Court has never sanctioned by approving a preferential classification in the absence of a proven constitutional or statutory violation.
 
 
 204
 The majority also seeks support for its position in "Mr. Justice Powell's citation with approval of two cases involving affirmative action remedies imposed under Executive Order 11,246, (citation omitted) without detailed findings of past discrimination." Maj. op., supra, p. 1337. See 438 U.S. at 301, 98 S.Ct. at 2754, citing Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 405 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Associated General Contractors of Massachusetts, Inc. v. Alshuler, 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 275 (1974). In so doing, the majority ignores Mr. Justice Powell's crucial assertion that "(e)very decision upholding the requirement of preferential hiring under the authority of Executive Order 11,246 has emphasized the existence of previous discrimination as a predicate for the imposition of a preferential remedy." 438 U.S. at 301 n.40, 98 S.Ct. at 301 n.40 (citation omitted and emphasis added). Here we have no finding of the existence of previous discrimination as a basis for imposing such a remedy. Mr. Justice Powell did say that "(s)uch (racial) preferences also have been upheld where a legislative or administrative body charged with the responsibility made determinations of past discrimination by the industries affected, and fashioned remedies deemed appropriate to rectify the discrimination."[10] 438 U.S. at 301, 98 S.Ct. at 2754 (emphasis added). In the instant case we have been presented with no determination whatever by the Department of Justice that the City of Miami had a history of past discrimination.[11] We have before us merely the fact that the Department of Justice gave its administrative approval to a particular remedy by signing the consent decree. I, for one, cannot equate the Department's signing a consent decree with its having made a determination that a particular employer has a history of past discrimination. If the two acts were in some way equivalent, the employer by signing the consent decree would in a sense be admitting a past history of discrimination, despite the express provision in the consent decree that its entry "shall not constitute an adjudication or an admission by any of the defendants of any violation of law." For the majority to conclude that "(n)othing more is constitutionally required by the opinion of Mr. Justice Powell," maj. op., supra at p. 1338, than the Department of Justice's signature on the consent decree requires a tortured and, I fear, erroneous interpretation of Mr. Justice Powell's opinion in Bakke that I cannot endorse.
 
 
 205
 Perhaps even more troubling to me is the majority's suggestion that a court can impose quotas to rectify the effects of societal discrimination. Maj. op., supra at p. 1338. This is precisely the course Mr. Justice Marshall would have us follow, see Bakke, 438 U.S. 265, 387, 98 S.Ct. 2733, 2798, 57 L.Ed.2d 750 et seq. (Marshall, J., dissenting), and it is implicit in the language of Mr. Justice Brennan cited by the majority at p. 1338. It is clear beyond peradventure, however, that the Supreme Court has not been willing to impose quotas to redress societal discrimination against a particular class. If societal discrimination were the litmus for the application of quotas, racial quotas could be imposed upon virtually any employer and against his "majority" employees, since discrimination, sadly, has been pervasive in our society's past. See 438 U.S. at 387, 98 S.Ct. 2798 et seq. (Marshall, J., dissenting). Even to hint that past discrimination by society in general affords federal courts a license to impose quotas against particular employers, as I believe the majority does, is an action that I cannot condone and that the Supreme Court refused to take in Bakke, thus provoking Mr. Justice Marshall's dissent.
 
 
 206
 With today's decision, the wheel appears to turn full circle to the one-discredited reasoning of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed.2d 256 (1896).[12] Plessy found in the Constitution permission for deliberate legislative discrimination against blacks as a class; here we conclude that it permits planned and purposeful discrimination against whites and males because they are involuntary members of a class preferred unjustly in the past. Thus, the momentum developed in abandoning one injustice carries us into still another, its opposite. We lay it down that two constitutional wrongs do indeed make a right.
 
 
 207
 Like my Brothers, I respectfully confess that I cannot discern the Court's precise position on this difficult subject from the opinions in University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). I can, however, say with certainty that the Court was then by the margin of one vote unready to write into the Constitution again, as it once did in Plessy and as the majority does today, a license for governmentally engineered race discrimination when that seemed desirable as a matter of contemporary policy. With the Chief Justice,[13] I confess that such a policy of uplifting the downtrodden holds deep, short-run appeal for me. If I were an elected official, holding a valid policy warrant, and if my views of the nature of the Constitution permitted me to do so, I might well endorse what we here do though with grave misgivings about the deliberate injustice occasioned to persons who did not choose to be born male or white. I am not a legislator, however, and broad policy is therefore not my domain; my concern is the Constitution.
 
 
 208
 Those like myself, who have not felt the lash of race or sex prejudice, can never know how deeply it cuts, and I am very far from weighing such wrongs and indignities lightly. But even bearing in mind the cynic's gibe at the majestic evenhandedness with which the law forbids both rich and poor to sleep under bridges, I still cannot bring myself to believe that in the long haul the interests of our people are well served by constitutional decisions that recoil from one class injustice to another. I therefore would refuse, in this confused and confusing case, with the ink hardly dry on Bakke and Weber, to take such a constitutional giant step. Henceforth, if I read the majority correctly, employers public and private become liable to governmental pressure, and their "majority"[14] employees to government-induced race and sex discrimination, whenever a statistical "imbalance" is perceived, pressure unrestrained by any constitutional trammel except whatever a court may from time to time view as an unreasonable degree of racial or sexual discrimination. And so, in our circuit, "majority" and "minority" are to become words of art cast free entirely from that numerical reference by which I had thought their use derived its main force and equity: a special concern for groups of citizens who are unfairly locked in disadvantaged positions by permanent and irrelevant common characteristics and who cannot, because of their numerical weakness, break out via the electoral process.[15]
 
 
 209
 I fully recognize that today's holding does not want for either reason or redeeming features. As for reason, it well may be that when Title VII's prohibitions against race discrimination with their infinitely more explicit language and unambiguous history were overthrown in Weber, it was ordained that those of the fourteenth amendment could not long survive. Nor is the majority rule freighted with such discredited trappings of racial prejudice or assumed class inferiority as informed the earlier "wisdom": far from it; all that the present constitutional ruling countenances is straight class discrimination, not class prejudice. Finally, by the lights of our day, the purpose of the holding is at least as well intended as was Plessy, which bowed in its own day to what the Court doubtless viewed as current realities.
 
 
 210
 But I, for one, do not find those lights clear enough for such work as rechiselling a license for class discrimination in constitutional stone. The Supreme Court pulled up at that brink in Bakke. Today's majority goes on, but without me. I respectfully dissent.[16]
 
 
 
 [1]
 On February 6, 1976, these defendants filed an amended answer which raised a fourteenth affirmative defense. On February 11, they filed a "motion to dismiss class action," which appears never to have been acted upon by the court. It does not appear that the United States ever attempted to state any class claims, or to have this action certified as a class action
 
 
 [2]
 In the meantime, FOP and PBA had commenced discovery against the United States, and a motion to intervene as plaintiff by the Miami Community Police Benevolent Association (an association of black officers of the City of Miami Police Department) was denied
 
 
 [3]
 Discovery had continued to proceed, and the Miami Dade General Employees Association had moved to intervene as a defendant
 
 
 [4]
 The text of the decree is set out as an Appendix to this opinion
 
 
 [5]
 Equal Employment Opportunity Act of 1972, P.L. 92-261, 86 Stat. 103 (amending 42 U.S.C. §§ 2000e to 2000e-17)
 
 
 [6]
 Reorganization Plan No. 1 of 1978, reprinted in (1978) U.S.Code Cong. & Admin.News 9795
 
 
 [7]
 The Supreme Court and lower courts have recognized that later statements by Congress clarifying the meaning of earlier legislation carry significant weight in the construction of the legislation. See, e. g. Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 1952 n.7, 60 L.Ed.2d 560 (1979); Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 89 S.Ct. 1794, 1801 n.8, 23 L.Ed.2d 371 (1969); N. A. A. C. P. v. Medical Center, Inc., 599 F.2d 1247, 1257 (3d Cir. 1979)
 
 
 [8]
 As since amended, this section is now codified in 31 U.S.C. § 1242
 
 
 [9]
 Now codified in 42 U.S.C. § 3766. FOP also argues that jurisdiction under these statutes was not properly pleaded, and that the prerequisites for bringing suit under these sections were not complied with. We fail to understand what the FOP believes the United States did not do that was required to establish jurisdiction, as the complaint plainly asserts jurisdiction under these sections, and the FOP never states what prerequisites are necessary or where such prerequisites can be found
 
 
 [10]
 Section 122(a) of the State and Local Fiscal Assistance Act of 1972, supra, stated:
 No person in the United States shall on the (basis) of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity, funded in whole or in part with funds made available under (this subtitle).
 Section 518(c)(1) of the Crime Control Act of 1973, supra, stated:
 No person in any State shall on the ground of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under this title.
 
 
 [11]
 The FOP's use of the quoted language seems to indicate that it believes the right asserted stems from the Fourteenth Amendment although it never so states and cites no authority for its assertion
 
 
 [12]
 The trial court did not dismiss the FOP from the action because it apparently felt that one provision of the consent decree would apply to the FOP:
 The Defendant City of Miami, its officials, agents, employees, and all persons in active concert or participation with them in the performance of City functions (hereinafter collectively referred to as the City) are permanently enjoined and restrained from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the City of Miami because of such individual's race, color, sex or national origin . . . .
 Since this provision does no more than restrain those affected from breaking the law, the FOP does not, and cannot possibly, complain that the provision abridges its rights.
 
 
 [13]
 It should be understood that we are now dealing with the FOP's rights as an organization, rather than any derivative rights it may have standing to assert as the representative of its members. The FOP's derivative rights will be discussed in part III, infra
 
 
 [14]
 Fed.R.Civ.P. 19 provides in pertinent part:
 (a) Persons to Be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest . . . .
 When the court vacated the consent decree on April 2, 1976, it stated that certain provisions of the decree directed activities by the city which would violate certain provisions of the collective bargaining agreement between the City and FOP. The possibility that this conflict would exist, as well as the possibility that actions of the FOP might interfere with any relief the court might grant, were apparently what led the United States to join the FOP as a defendant.
 
 
 [15]
 Fed.R.Civ.P. 41 allows a lawsuit to be dismissed at any time by the consent of all parties
 
 
 [16]
 Recently, consent decrees in antitrust suits brought by the United States have been added to this list. See 15 U.S.C.A. § 16(e) (West Supp.1979)
 
 
 [17]
 See pp. 1334-1335, infra
 
 
 [18]
 Unlike situations in which the parties are attempting to secure a settlement in a bankruptcy proceeding, shareholder derivative suit, or class action litigation, we need not fear here that any party is attempting to profit at the expense of unrepresented individuals. When the Justice Department advocates a settlement, we need not fear that its pecuniary interests will tempt it to agree to a settlement unfair to unrepresented persons. To the extent that financial concerns enter the decision-making process at all deliberations at the Justice Department, it is likely to be in the form of resource limitations tempting the responsible officials to accept compromise settlements providing relief short of what might be obtained at trial, in order that litigation resources may be marshalled for use against more recalcitrant offenders. See Zimmer and Sullivan, Consent Decree Settlements, 1976 Duke L.J. 163, 197 n.110 (1976). Although this is of concern to members of classes discriminated against who seek additional relief, see City of Jackson, supra, this possibility clearly did not underlie the trial court's concerns about the proposed settlement. We also note that the Justice Department must represent the interests of all citizens, white as well as black, males as well as female. This is thus a further constraint on any tendency for affirmative action relief to go too far
 
 
 [19]
 Here of course, the FOP was actually a party to the lawsuit. Its submission of briefs and arguments ensured that the judge, as well as the government attorneys prosecuting the case, were aware of the interests of the FOP's members
 
 
 [20]
 When the defendant in a discrimination suit objects to the relief sought by the government or a private plaintiff, the trial court has a well-defined inquiry: whether past discriminatory practices have occurred, and, if the defendant is shown to have discriminated, to what extent Title VII or other anti-discrimination statutes relied on requires that they be remedied. See generally International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). If the statute does not authorize relief for a certain type of proven discrimination, the trial court cannot order the defendant to provide it; if the statute does authorize relief, the trial court will ordinarily be given broad discretion in fashioning an appropriate "make-whole" remedy. See, e. g., Morrow v. Crisler, 491 F.2d 1053 (5th Cir.), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). This discretion is appropriate because the trial court will, after a trial of the disputed issues, be highly familiar with the extent of the violation; it is also necessary because the parties, left to their own devices, have failed to agree upon appropriate relief
 
 
 [21]
 See p. 1339, infra
 
 
 [22]
 See Alaniz v. California Processors, Inc., 73 F.R.D. 289 (N.D.Cal.1976), appeal on other grounds dismissed sub. nom. Alaniz v. Tillie Lewis Foods, 572 F.2d 657 (9th Cir.), cert. denied, 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978)
 
 
 [23]
 The history of the attempt to end discrimination in the fire department of the City of St. Louis is illustrative of the delay in ending discrimination that can be caused by protracted litigation, or avoided by settling the lawsuit by consent. The first complaint alleging discrimination was filed in January, 1974. After the Justice Department filed its own suit, and a class of non-black employees intervened, a trial was held. In mid-1976, the district court issued an order mandating affirmative action. An appeal was heard, Firefighters Institute, Etc. v. City of St. Louis, Mo., 549 F.2d 506 (8th Cir. 1977), certiorari was denied, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977), the case was remanded to the district court, further orders were entered, another appeal was heard, 588 F.2d 235 (8th Cir. 1978), certiorari was denied again, --- U.S. ----, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979), and the case returned to the district court. During these years, the number of black fire captains in the St. Louis Fire Department decreased from four to one and discriminatory policies were continued. Firefighters Institute, supra, 588 F.2d at 240
 
 
 [24]
 Congress has clearly indicated its intent that Title VII suits be handled by the courts as expeditiously as possible. See 42 U.S.C.A. §§ 2000e-5(f)(2), 2000e-6(b) (West 1974)
 
 
 [25]
 In Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976), the Sixth Circuit stated the principle well:
 Settlement agreements should . . . be upheld whenever equitable and policy considerations so permit. By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before over-burdened courts, and to the citizens whose taxes support the latter. An amicable compromise provides the more speedy and reasonable remedy for the dispute.
 
 
 [26]
 We refuse to engage in any semantic dispute over the difference in meaning between "goals" and "targets" on the one hand and "quotas" on the other. We will gladly adopt any word proposed, so long as the thrust of affirmative action is not stayed
 
 
 [27]
 United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) upheld affirmative action in the context of a collective bargaining agreement with a private employer. Although that narrowly-drafted opinion is not directly relevant to the constitutional issue posed in the instant case because the defendant employers are municipalities, it does buttress our firm belief that affirmative action is consistent with the public policy of this country. Weber does establish that §§ 703(a) and (d) of Title VII, 42 U.S.C. § 2000e-2(a) and (d), do not bar the relief denied below. Although the defendants here were municipalities, unlike in Weber, it is now well-settled that Title VII standards do not vary depending on whether the defendant is a private or public sector employer. See Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); Scott v. City of Anniston, Ala., 597 F.2d 897 (5th Cir. 1979); United States v. City of Chicago, 573 F.2d 416 (7th Cir. 1978); Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506 (8th Cir.), cert. denied, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977)
 
 
 [28]
 We also note that Mr. Justice Powell carefully avoided stating that preferential classifications not based on proven illegalities are per se unconstitutional; rather, he couched his discussion of this relationship in negative terms: e. g., "we have never approved preferential classifications in the absence of proven constitutional or statutory violations." Bakke, supra, 98 S.Ct. at 2755 (opinion of Justice Powell)
 
 
 [29]
 Congress has also particularly noted the problem of discrimination by public sector employers. In 1972, Congress amended Title VII to include public sector employers within the scope of its provisions. In its report on the amendments, H.Rep.No.92-238, reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 2137, 2152, the House of Representatives focused explicitly on discrimination by public sector employers:
 In a report released in 1969, the U.S. Commission on Civil Rights examined equal employment opportunity in public employment in seven urban areas located throughout the country North as well as South. The report's findings indicate that widespread discrimination against minorities exists in State and local government employment, and that the existence of this discrimination is perpetuated by the presence of both institutional and overt discriminatory practices. The report cites widespread perpetuation of past discriminatory practices through de facto segregated job ladders, invalid selection techniques, and stereotyped misconceptions by supervisors regarding minority group capabilities. The study also indicates that employment discrimination in State and local governments is more pervasive than in the private sector. The report found that in six of the seven areas studied, Negroes constitute over 70 percent of the common laborers, but that most white-collar jobs were found to be largely inaccessible to minority persons.
 
 
 [30]
 Justices Brennan, Marshall, White and Blackmun
 
 
 [31]
 We note that Justice Brennan's opinion accords no deference to the lower courts' conclusion that the plan was unreasonable. Id. at 2792-93. We follow the same approach here, and undertake a full inquiry into the reasonableness of the proposed consent decree
 
 
 [32]
 Although the percentage of blacks in the City of Miami labor force in 1970 is quite close to the percentage of city employees in 1976 who were black, this lone statistic does not affect our conclusion in light of the evidence concerning job classifications and salary ranges
 
 
 [33]
 The statement of uncontested facts indicates that the City of Miami labor force is approximately 20.4 percent black, 46.9 percent Spanish-surnamed, and 44.0 percent female. Because the overlaps among these groups are not shown by these statistics, we cannot determine the precise total percentage of minorities and women in the labor force. However, it appears to exceed the highest percentage goal for women and minorities set in the decree, which is 56 percent
 
 
 [34]
 The FOP has never come forward to present any evidence to the trial court indicating that any of the goals used are unreasonable or would foreclose all opportunities to white workers. Absent evidence, we will not presume that a decree negotiated and discussed as carefully as this one has been will have such effects. We note that the Sixth Circuit has recently issued instructions to a district court which appear to endorse a presumption of reasonableness for targets and goals which mirror workforce percentages. See Detroit Police Officers' Association v. Young, 608 F.2d 671 at 696-697 (6th Cir. 1979)
 
 
 [35]
 § 703(h) states, in pertinent part:
 Notwithstanding any other provision of this subchapter, it shall not be unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.
 
 
 [36]
 Since FOP's argument is patently without merit, we need not decide whether it has standing to raise this issue on appeal, given the District Court's finding, which it does not attack, that the Consent Decree does not violate the contractual relationship between the City and the FOP
 
 
 [37]
 Also, in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), a class action suit challenged a provision in a collective bargaining agreement which awarded additional seniority to veterans equal to their period of service in the armed forces of the United States during World War II. Employees who had already started working at Ford were thus surpassed in seniority, and subject to lay-off before, subsequently-hired employees with seniority credit for military service. Despite this interference with the expectations of those who were employees at the time the collective bargaining agreement was signed, the provision was upheld. Cf. Hayden v. RCA Global Communications, Inc., 443 F.Supp. 396 (N.D.Cal.1978) (union and employer may amend collective bargaining agreement even if amendment affects seniority rights of some employees); Southerlan v. Office and Professional Employees International Union, Local No. 277, 396 F.Supp. 1207 (N.D.Tex.1975) (same)
 
 
 [38]
 It is indisputable that elimination of racial discrimination in employment is an important public policy interest. See Franks, 96 S.Ct. at 1271 & n. 40
 
 
 [39]
 For example, it is possible that under some circumstances an employer who voluntarily adopted an affirmative action plan which causes an employee to be deprived of such a vested right under his employment contract might contractually be liable to the employee in damages, although the plan is perfectably acceptable under the Constitution and laws of the United States
 
 
 [1]
 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979)
 
 
 [2]
 See Meltzer, The Weber Case, 3 Regulation 34, 42 (1979)
 
 
 [3]
 And here, as in Weber, the appeal to reality in foregoing such findings is made: it is urged that to require such a finding or admission would be to subject the employer to "untold consequences." Concurrence of Judge Thornberry, 614 F.2d 1351. Overlooked by that argument, however, are the "untold consequences" of permitting the imposition of racial quotas without such a finding for the employer's "majority" employees, see n.14, infra, whose rights are bartered away by the employer in order to buy his private peace. In a head-to-head tort or contract case the rights of third parties are not implicated; the parties may bargain away their own rights for whatever reasons they may choose. In contrast, the consent decree at issue here profoundly affects the constitutional rights of third parties the employer's non-Black, non-Hispanic, or non-female employees to be free from discrimination on account of their race or gender. See nn.14-16 and accompanying text, infra. If the city is to be allowed to evade untoward consequences to itself by visiting constitutional infringements on its white male employees, surely simple justice requires at the barest minimum that first it be shown that they, or at least their class, have been unfairly favored by the city in the past
 
 
 [4]
 United States Bureau of the Census figures, noted in Sowell, Myths About Minorities, 68 Commentary, No. 2, p. 33 (1979)
 
 
 [5]
 For example, the statistics failed to account for educational qualification for positions or for job experience
 
 
 [6]
 The majority notes with apparent satisfaction that its recited statistics have not been challenged. P. 1338. That is hardly surprising as there has been no trial at which to mount a challenge. Doubtless they are correct, as far as they go which is not far enough to prove what the majority seems to believe they do
 
 
 [7]
 The central provision of that statute makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2
 
 
 [8]
 See Morrow v. Crisler, 479 F.2d 960, 962 (5th Cir. 1973) (panel opinion). "The evidence presented in this case amply supports the District Court's conclusion that the policies and practices of the defendants constitute a pattern and practice of racial discrimination in hiring and employment in violation of the Fourteenth Amendment . . . ." Indeed it did: at the time of the trial court decree, the Mississippi Highway Patrol had never in its history had a black patrolman
 
 
 [9]
 If Bakke overruled Morrow sub silentio, the majority's approving citation of Morrow is without significance
 
 
 [10]
 In Contractors Association of Eastern Pennsylvania, supra, the Assistant Secretary of Labor had issued an order containing
 findings that although overall minority group representation in the construction industry in the five-county Philadelphia area was thirty percent, in the six trades representation was approximately one percent. It found, moreover, that this obvious underrepresentation was due to the exclusionary practices of the unions representing the six trades. It is the practice of building contractors to rely on union hiring halls as the prime source for employees.
 442 F.2d at 173 (emphasis added). Although findings of this ilk are at least one step removed from findings of past discriminatory conduct on the part of particular employers as in Morrow, there are nevertheless executive findings directly linking the hiring procedures of a group of employers to discriminatory union practices. And while I might prefer more before approving a quota remedy, see, e. g., Morrow v. Crisler, supra, I cannot abide less. Nor can Justice Powell, as I read his opinion in Bakke. No even remotely comparable findings to those in Contractors Association of Eastern Pennsylvania were made in the instant case; here there have been no "legislative or administrative . . . determinations of past discrimination . . . ." 438 U.S. at 301, 98 S.Ct. at 2754.
 In Associated General Contractors, supra, the district court used statistics of racial disparity "as sufficient evidence to support an inference of racial discrimination." 361 F.Supp. 1293, 1299 (D.Mass.) (emphasis added), aff'd, 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 275 (1974). That inference, however, was not overcome "by any contrary evidence." Id. The court concluded that racial imbalance in the Boston construction trades was "the result of past discriminatory practices on the part of many 'entities' in that industry." 490 F.2d at 18 n.15. Thus, there was a trial-level, judicial determination of past discrimination predicated on an unrebutted inference. In the instant case, to the contrary, we have no judicial determination; we have at best only an inference of discriminatory practices made by ourselves, on demonstrably insufficient data. By signing a consent decree, the parties have chosen not to enter a forum in which the City of Miami could rebut that inference. I do not see how that decision operates to transform an inference into a factual finding. If a naked inference can give rise to the imposition of quotas, then Mr. Justice Powell's careful analysis is drained of its substance and rendered meaningless.
 
 
 [11]
 Such a unilateral determination by one party litigant would have an unsettling, boot-strap quality, even had one been made; and it may be doubted whether the Department, acting generally, constitutes such a "legislative or administrative body charged with the responsibility" of making determinations of discrimination in the employment context as Justice Powell had in mind in the passage quoted in text above. His reference is to the Department's special responsibilities under section 5 of the Voting Rights Act. 438 U.S. at 302 n.41, 98 S.Ct. at 2755 n. 41
 
 
 [12]
 See Van Alstyne, Rites of Passage: Race, the Supreme Court, and the Constitution, 46 U.Chi.L.Rev. 775 (1979)
 
 
 [13]
 Weber, 443 U.S. at 216, 99 S.Ct. at 2734, 61 L.Ed.2d at 497
 
 
 [14]
 To state the matter so makes plain that what in fact we do here is to require class discrimination in favor of two minorities (Blacks and Hispanics) and a majority (women) against another minority (white males). Thus we do what Mr. Justice Powell clearly said we could not do in Bakke :
 (T)he difficulties entailed in varying the level of judicial review according to a perceived "preferred" status of a particular racial or ethnic minority are intractable. The concepts of "majority" and "minority" necessarily reflect temporary arrangements and political judgments. As observed above, the white "majority" itself is composed of various minority groups, most of which can lay claim to a history of prior discrimination at the hands of the state and private individuals. Not all of these groups can receive preferential treatment and corresponding judicial tolerance of distinctions drawn in terms of race and nationality, for then the only "majority" left would be a new minority of white Anglo-Saxon Protestants.
 438 U.S. at 295-96, 98 S.Ct. at 2751.
 
 
 [15]
 But cf. Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973), (plurality opinion), lending credence to the view that women, though a majority, are to be viewed as a "minority" because "vastly underrepresented" in governmental positions of power. The calculus suggested is one infinitely complicated by the circumstance that, in our society, power and influence are exerted in myriad ways, many of great subtlety. Such a case-by-case balancing of results, dependent upon ad hoc determinations of what groupings in our society command the most power from time to time, seems to me an exercise for which judges are ill fitted
 And if any group, regardless of its numbers, can be a "minority," competition for the favors attending that status seems well-nigh inevitable, with those who have officially received it fighting off aspirants to it and struggling to preserve their status as such. Indeed, it appears to be in progress at the present time. See Van Alstyne, op. cit. n.12, supra, at 805-807, quoting from The Washington Post of May 22, 1979:
 A highly unusual and controversial proposal under consideration by a city agency would eliminate a large number of local ethnic groups from eligibility for lucrative minority contracts with the District of Columbia government.
 The proposal, by the staff of the Minority Business Opportunity Commission, would eliminate from minority status all Hispanics born in Europe and South and Central America, leaving only those Hispanics born in Mexico or Puerto Rico eligible for the contracts.
 The proposal also would eliminate from minority status persons born in Vietnam, India, China, Korea and Africa.
 "Oh, my God," one influential Hispanic leader with ties to the Barry administration said when informed of the staff proposal. "If Marion agrees to do something like that, then it's really going to be a political war between Hispanics and blacks, and that would be terrible."
 Carlos Rosario, acting director of the Office of Latino Affairs for the District, said he was not familiar with the proposal. But, he said, "I don't see why if they have Spanish heritage why they should lose their (eligibility for minority contracts). If they are born minorities, they should have the same breaks as others."
 See also The Wall Street Journal, March 21, 1980, at 16, col. 2:
 In the department of racial and ethnic privileges, "minority group" members get special aid from the Small Business Administration. The legislation was written to help blacks and Hispanics, and now also covers American Indians and "Asian Pacific Americans." We hear the Pakistani-Americans are about to have a go at it, but the program is in a tizzy because a group of Hasidic Jews has just petitioned the SBA to be counted as a minority.
 While the Hasidim can point to all the usual kinds of disadvantages, their petition is opposed by the author of the legislation, Rep. Parren J. Mitchell. "I might be sympathetic toward their economic conditions," Rep. Mitchell allows, but to put the philosophical point, "there's a limited pie."
 
 
 [16]
 At the conclusion of my writing, I have been given my Brother Thornberry's concurring remarks. It may well be possible, as he observes, to place a different sense than mine upon some of what we say here, but there can be no doubt whatever about what we do. Nor am I so much taken as he by the circumstance that we deal with a consent decree, where the "consent" is a compelled one, and the agreement is of that special kind by which A and B agree together about the constitutional rights of C and D. I can see no reason to give our imprimatur to this particular constitutional violation when we would doubtless strike down a proposed agreement to disregard any other provision of the Bill of Rights